DE ARMAS ET AL. *vs.* MAYOR, &c. OF NEW-ORLEANS.

DE ARMAS
ET AL.
*vs.*
MAYOR, ETC. OF
NEW-ORLEANS.

APPEAL FROM THE COURT OF THE FIRST DISTRICT.

Permission having been given by the Governor of Louisiana, when a province, to occupy and build on a lot of land in the City of New-Orleans, and the authority of the government, which gave the permission, having ceased without a change of will being expressed, a subsequent grant by the President of the United States to the occupant under that permission, vests in him all the right and title of the United States, and of the former sovereigns of the country.

While the province of Louisiana formed a part of the dominions of the King of Spain, he had the right of property in all the unappropriated territory of the province.

The King of Spain delegated to the Governor of Louisiana, while a Spanish province, the right to concede or grant to individuals, parts of the land belonging to the public domain.

The sovereigns of Europe have the right to alienate the vacant and unappropriated lands in their colonial dominions.

The word *quai,* includes the levee on the bank of the river, and the space between the exterior limit of the levee and the water.

The United States have full authority over ports of entry; they can establish, and perhaps abolish them; and they may regulate quays as appendages to them.

The circumstance that a space of ground is left vacant on the plan of a city, is not sufficient to show it to be a public place.

The plan of the city must show the destination and appropriation of lots to public uses, and as public places, in order to imply a promise on the part of the original owner of the soil and founder of the city, that the lots shall always remain open for the use of the public.

In deciding questions of title, the court cannot take into view the want of foresight in the sovereigns of the country in granting the land in controversy to individuals, or the great detriment which the public interest may sustain by the appropriation of the land to private purposes.

This was a petitory action, brought for the recovery of a piece of ground containing three thousand one hundred and

seventy-six superficial feet and four inches, situated in the city of New-Orleans, between St. Philip and Main streets, and between the river and the front row of houses.

The plaintiffs are the vendees of the heirs of Thomas Bertrand, or Beltran. His dwelling house having been destroyed by fire in the great conflagration of one thousand seven hundred and eighty-eight, in the city of New-Orleans, a few days afterwards he presented to the then governor of Louisiana, a petition, of which the following is a translation.

"*Senor Governor:* Antonio Beltran, an inhabitant of the city, states to your grace with the most profound respect, that the house which he inhabited having been burned on the twenty-first of this month, and having no place to take refuge in, he has determined to build, a small house in front of that of Mr. Bienvenu; therefore, he earnestly begs that your grace would deign to grant him permission for what he asks, a favor which he expects from the goodness of your grace."

"*New-Orleans,* 28th March, 1788."

The decree of the governor was: "As is requested," and was signed by himself. "MIRO."

Six years afterwards, Bertrand petitioned for the renewal of his privilege, as follows:

"*Senor Governor-General.* Thomas Bertrand, a *Cabaratier* of this city, states to your grace, with the most profound respect, that three months ago he presented a memorial to your grace, begging that you would grant him permission to rebuild a cabin (cabana) or small house which he has fronting the levee and in front of the house of the auditor of war, in consequence of the timbers of the said house having rotted by reason of the long continuance of the rains, having lost the few clothes or effects which belong to himself and his children. For this reason, and because the roof is about to fall in, he earnestly prays your grace, through your well known goodness, to give him leave to rebuild said house, since it is exposed to injury, from the condition of the materials, a favor which he expects from the great kindness of

EASTERN DIS.
*February,* 1833:

DE ARMAS
ET AL
*vs.*
MAYOR, ETC. OF
NEW-ORLEANS.

your grace, whose important life may it please God to preserve many years."

"THOS. BERTRAND."

"*New Orleans,* 17*th June,* '94."

This petition was granted in the following terms:

"NEW-ORLEANS, 16th June, 1794.

"*Granted,* but the same dimensions which the present house has, are to be preserved."

"THE BARON DE CARONDELET."

In one thousand eight hundred and three, Bertrand died. His widow (Gonzales) continued to reside in this cabin until after Louisiana was ceded to the United States. In one thousand eight hundred and seven, after congress established a board of commissioners to adjust land titles in Orleans Territory, Madam Gonzales procured one B. Lafon, (who styles himself deputy surveyor of J. Briggs, &c.) to lay off the ground on which her cabin stood, into a lot. Lafon states that he called on her for the papers which authorised her to have the survey made, and she presented him with the two *permissions* of Miro and Carondelet. From these two papers, the surveyor says he proceeded to measure off the lot to Madam Gonzales, in presence of witnesses, and to fix its boundaries, from which there resulted to her three thousand one hundred and seventy-six superficial feet, and four inches of ground.

The widow Gonzales filed these two *permissions,* and the *proces verbal* of Lafon's survey with the land commissioners. In reporting on her claim, the commissioners *conclude* by saying, " as we do not feel authorised to make any *decision* on this claim, we think it would be more an act of justice than of generosity, if the government should confirm it."

No special act was ever passed confirming it. But in eighteen hundred and twenty-one, a patent issued from the general land office, signed by the president of the United States, confirming "Madam Gonzales in her claim for a *lot of ground,* in the city of New-Orleans, fronting on the levee, &c." in pursuance of an act of congress, passed the second

EASTERN DIS.
*February*, 1833.

DE ARMAS
ET AL.
*vs.*
MAYOR, ETC. OF
NEW-ORLEANS.

of March, one thousand eight hundred and five, for the adjustment of land titles in the Territory of Orleans, and one of the twelfth of April, one thousand eight hundred and fourteen, for the *final* adjustment of land titles, &c.

The plaintiffs allege that the patent was also authorised to issue on this claim, by the provisions of an act, passed May the eleventh, one thousand eight hundred and twenty. It provides, "that claims for lands in the eastern district of Louisiana, described by the register and receiver in their report to the commissioner of the general land office, on the twentieth November, one thousand eight hundred and sixteen, *and recommended* in the said report for confirmation, are hereby confirmed against any claim on the part of the United States."

The other two acts recited in the patent, provide: First, the one of one thousand eight hundred and five, in substance, "that persons who obtained from the French or Spanish governments, prior to October first, one thousand eight hundred, any duly registered warrant or order of survey of *lands*, and which were at that time actually *inhabited* and *cultivated*, shall be confirmed in their claims. Second, every person being the head of a family, who had prior to the twentieth of December, one thousand eight hundred and three, with the permission of the proper Spanish officer, and in conformity with law, usage and other customs of the Spanish government, made *an actual settlement* on a tract of land, &c., and who did on the twentieth of December, one thousand eight hundred and three, *actually inhabit* and *cultivate* the said *tract of land*, it shall be *granted, &c.*"

The act of the twelfth of April, one thousand eight hundred and fourteen, says, "that every person claiming *lands* by virtue of any incomplete French or Spanish grant, concession, or any warrant or order of survey, granted prior to December twentieth, one thousand eight hundred and three, whose claims have not been filed with the proper officer, etc., and are embraced in the report of the commissioners, etc., in every case where it shall appear by the said report, etc., that the *concession warrant*, or order of survey, under which

EASTERN DIS.
February, 1833.

DE ARMAS
ET AL.
vs.
MAYOR, ETC. OF
NEW-ORLEANS.

the claim is made, contains a special location, or *had been actually located or surveyed before the twentieth of December, one thousand eight hundred and three*, shall be *confirmed, &c.*" The corporation of New-Orleans pleaded a general denial to the allegations of the petition. They show that they have possession of the *locus in quo;* that they exercise the right to regulate the use of it for the benefit of the public. They claim it as a part of the quay and port of the city. They allege that it cannot be the subject of private property; that no absolute grant was ever made to Bertrand; that the permissions above recited were only to build and occupy a temporary cabin on the levee. They allege that in pursuance of a decree of the Superior Court, in one thousand eight hundred and twelve, that Bertrand and his wife had no title; the family was removed, the cabin demolished, and the land cleared. They allege that at the foundation of the city by the French government, a large space denominated a *quai*, was left between the front row of houses and the river, for the use of the inhabitants of the city and the public; and that the *locus in quo* constitutes a part of this quai. They deny the authority of the Spanish government to grant or concede the lot in question, and the authority of the president of the United States, to issue the patent under which the plaintiffs claim.

The counsel for the corporation offered in evidence two plans of the city of New-Orleans, to show the *space* in which the *locus in quo* is situated, was designated on said plans from the foundation of the city, in one thousand seven hundred and twenty-four, and one thousand seven hundred and twenty-eight, as a "*quai*," and set apart for the use of the public. This evidence is admitted by the plaintiffs in the record, in the following terms:

1. "It is admitted there existed a long time before the French revolution, an officer or bureau attached to the department of the marine and the colonies at Versailles, in France, in which were deposited the manuscripts of all the plans of the cities founded under the authority of the French government in its colonies.

2. " That the plan of New-Orleans, the one made by *Dupauger*, in one thousand seven hundred and twenty-four, and the other by *Broutin*, in one thousand seven hundred and twenty-eight, which were produced by the defendants, in this case are the most ancient plans of said city, which were found in said deposite.

3. " That the said Dupauger and Broutin were both engineers for the king of France, and employed as such in Louisiana at the time they made the aforesaid plans."

The record contains the following admission.

" It is admitted by the plaintiffs, that previous to the cession of Louisiana from France to Spain, there were several sales of lots made under the French government. Said lots fronting the river were sold with the description of *face au quai.*"

Judgment was rendered in the court below for the plaintiffs, and the defendants appealed.

*Moreau Lislet,* for the appellants.

1. That from the foundation of the city of New-Orleans, all the vacant space figured or designated on the plan of the city, between the river Mississippi and the first row of houses fronting the river, was reserved by the founder to serve for the *quais* of the port of New-Orleans.

This proposition is supported by three ancient plans of the city.  1. That of Depauger, the king's engineer for this province, drawn in one thousand seven hundred and twenty-four.  2. Another plan by Broutin, royal engineer, made in one thousand seven hundred and twenty-eight.  3. And one which appears to have been made by the same engineer, of the city and its improvements in one thousand seven hundred and forty-four, and engraved in Charlevoix's History of New France, vol. 2. 432, 3.

2. That there existed from time immemorial at Versailles, in France, a bureau, attached to the marine department, where were deposited the official charts, plans, &c., of all the cities and fortifications of the French colonies in America.  The corporation discovered there, in one thousand

18

eight hundred and nineteen, the plans of New-Orleans, which were produced in evidence, and which are the most ancient plans of the city, existing in that bureau.

3. That in France, plans of cities are made, which serve for titles to the inhabitants thereof; and in default of these plans, long possession by the *inhabitants* supplies the place of ancient titles. *Favard de Langlade, Nouv. Leg. aux mots plans des villes p.* 224, art. 1, 4.

4. That in France and her colonies, by the word *quai*, is understood a levee often paved with stones in cities and ports on navigable rivers, and a space left vacant between the river itself, and the first line of houses, for the convenience of a passage or way, and to prevent the overflow of the water, &c. *Dict. de l'Académie Fr. verbo quai.*

5. That in France there exists, in all the cities bordering on navigable rivers and the shores of the sea, *quais*, which sometimes belong to private persons when there has been a grant to that effect; but generally, they belong to the public domain. In the first case, these *quais* are maintained and repaired by the proprietors; and in the latter case, by the municipal authorities of the place. Those who support the charge receive in compensation a certain right of toll on all vessels and craft which land or touch at these *quais*. 2 *Valin, art.* 20 *and* 21, *and notes, p.* 475, 6. 1 *ibid., art.* 7 *and note p.* 140.

6. Whether *quais* belong to private persons, or to the public domain, the regulation of them is in the admiralty, but the use of them is in the public.

7. That public things, such as *quais*, are in the domain of the sovereign, but he cannot sell, grant, or otherwise dispose of them, unless for the common advantage or the public good, without abusing his powers. The sovereign himself has often declared his own acts null in this respect. *Vattel, sec.* 244, 5, 6. 3 *Martin,* 296, 303. 7 *N. S.* 81, 88, 92. *Récopilación, lib.* 7, *tit.* 7, *l.* 1. 3 *Toullier, no.* 27, 30, 31 and 32.

8. In France, *quais* do not mean simply a levee made of earth, or paved, which guard the city from inundations of the river, but they mean also a certain space of ground, which is

more or less considerable, as circumstances require, and which remains free to the use of the public, either for ornament, a public way or passage; and which is contained between the levee and the first row of houses fronting the river. *History of St. Domingo, by Moreau de St. Mary,* 1 vol. 305, 309. *Laws and constitutions of the French colonies, sous le vent,* 3 vol. 447, 771. 2 *ibid.* 725. 4 *ibid* 771, 2, 3, 1791, 1796. 5 *ibid.* 473, 651. 6 *ibid* 526, 568.

EASTERN DIS. *February,* 1833.

DE ARMAS ET AL. *vs.* MAYOR, ETC. OF NEW-ORLEANS.

9. That this space of ground, (*terre plein*) which is left open and free in France, in cities situated on rivers or navigable streams, is still more necessary in Louisiana, on the banks of the Mississippi, than in other countries, because the banks of this river are subject to fall in, and the riparian proprietors, even those in cities, are bound to make and repair their levees at their own expense; and to furnish land for new levees, when the first are carried away, by the irruptions of the river. *Vide Ordinances sur les Concessions.*

10. When Louisiana was under the French government, and since, even to this day, the levee in front of the city of New-Orleans, has always been made and repaired by the inhabitants of the city, or at their expense, without any compensation than a small toll on boats and vessels, which loaded and unloaded their cargoes in the port. *Vide Charlevoix's History of New France,* 2 vol. 432. *O'Reilly's Ordinances,* 20*th February,* 1770.

11. That the city of New-Orleans was not in reality established, until the year one thousand seven hundred and twenty-two and three, in the place where it is at this day, and the plan of Dupauger, dated in one thousand seven hundred and twenty-four, was in all probability made out about this period. Louisiana was then under the government of the western company, to whom the king of France had granted the exclusive privilege of its trade and commerce, with a species of sovereignty over its territory; such as the right of exploring and working its mines, making grants of its vacant land, and founding cities, &c.

12. The western company retro-ceded and abandoned its privileges to the king of France, and re-sold to him all its

EASTERN DIS.
February, 1833.
═══════════
DE ARMAS
ET AL.
vs.
MAYOR, ETC. OF
NEW-ORLEANS.

possessions in Louisiana, without making particular mention of the public property it owned in New-Orleans, or the *quais*, which proves it had established them for the public use of the inhabitants of that city. *Vide Charlevoix's History, &c.* 1 *Martin's History of Louisiana, vol* 1.

13. By the treaty of cession from France to Spain, of Louisiana, in one thousand seven hundred and sixty-three, although kept secret for political purposes, it is understood that neither the Spanish monarchs or their governors, could take possession of property thus dedicated to public use, and respected by the treaty under pretext of rules or laws, contrary to the treaty. 1 *Martin's History of Louisiana. Treaty of Cession.*

14. Although the kings and city councils of Spain sometimes arrogated to themselves the right of granting, to individuals, permission to establish themselves on public places, it was done in case of some good resulting thereby to the community; and in that case, though the proprietors could not be compelled to remove or demolish the buildings they had erected, if they were valuable, yet they were required to pay a *rent* to the city. *Récopilación de Castilla, lib.* 7, *tit.* 7, *l.* 9. *Decree of Louis XIV. April,* 1669.

15. The plaintiffs' counsel contends, that the inhabitants of a city can only hold lands by means of a title; that even immemorial possession cannot supply the defect. This doctrine was laid down by *Guyot,* in *Repertoire de Jurisprudence,* but is overruled by many decisions, a short time before the French revolution. *Collection des Decisions Nouvelles, vol.* 4, *&c.*

16. The king of France, although absolute before the revolution, forbid the magistrates of his courts of parliament to obey his letters patent or grants, when they made an alienation of his domain. 6 *Nouveau Denisart, p.* 593. *Verbo domaine, &c.*

*Eustis,* on the same side, contended:

1. That the validity of the patent offered in support of the plaintiffs' title, can be inquired into and adjudged upon

in the present suit. This proposition depends upon such high authority that it may be safely assumed. 11 *Wheaton*, 380, and the other cases there cited. 10 *Johns.* 23. 5 *Binney*, 154.

EASTERN DIS.
*February*, 1833.

DE ARMAS
ET AL.
*vs.*
MAYOR, ETC. OF
NEW-ORLEANS.

2. The patent is null and void, because the issuing thereof was without authority, and can have no legal force under the laws, in pursuance of which it purports to have been issued. These laws which were enacted for the final adjustment of land titles, and relate solely to *lands*, and not to *Urban* property or town lots.

3. The provisions in the laws of congress distinguish between public *lands* and *town lots*. The Supreme Court of the United States determined that a grant to enter *lands*, did not include town lots. 12 *Wheaton*, 587. *Land Laws*, 736, 788, 860.

4. The opinion of Mr. Gallatin while at the head of the treasury department, and charged with the administration of the public domain, supports this distinction. He says, in a letter of instructions addressed to the clerk of the land commissioners, dated August 6, 1811—"I consider the decisions on town lots where the title was not complete, as altogether *out of the jurisdiction of the board*, since one of the essential conditions was that of not only *inhabiting* but *cultivating;* an expression intended and applicable only to farms, or country tracts."

5. But supposing plaintiffs' title sufficient to transfer all the rights of the United States to them, what rights had the United States to the premises? By the treaty of cession, Louisiana was transferred to the United States in full sovereignty. And by the admission of Louisiana into the Union, on the footing of the original states, her sovereignty was acknowledged. The United States retained their *property* which belonged to them as property, but all the attributes of sovereignty over the territory, passed to the state of Louisiana.

6. So the right of appropriating public places, the banks of rivers, the shores of the sea, to private purposes, if it exist at all is an *apanage* of sovereignty inseparable from it, and is vested in the state.

EASTERN DIS.
*February,* 1833.

DE ARMAS
ET AL.
*vs.*
MAYOR, ETC. OF
NEW-ORLEANS.

7. Hence I infer the right of appropriating the space on the bank of the river in front of the city of New-Orleans, which includes the *locus in quo,* and which is necessary for the convenience of the port and the safety of the city, being a *right of sovereignty merely,* and not of property, cannot be exercised by the United States under the constitution.

8. But this space in the front of the city is not vacant land, or part of the public domain. It is shown by the ancient plans of the city exhibited in the evidence, that it was originally set apart as a public place, and denominated *a quai.* These plans being found in their ancient place of deposite, are evidence and authority to show the original destination of this open space as a public place. 1 *Starkie,* 167. *Peake on Evidence,* 129, 130.

9. The spot of ground in controversy is a public place, as a necessary part of the port. A port is public, and is like highways, streets and other public things. *Institutes, lib.* 1, *title* 1, *sec.* 1. 3 *Partida,* 28, 6. *Digest, lib.* 1, *title* 8, *art.* 9. *Digest, lib.* 43, *title* 14, *art.* 1.

10. A port is defined *locus conclusus quo importantur merces et inde exportantur eaque nihilominus statio est conclusa et munita. Inde angiportum dictum est. Digest, lib. ult. tit. pœnult. leg.* 59.

11. This spot of ground makes a necessary part of the port of New-Orleans, for the lading and unlading of ships, vessels, and of immense quantities of produce and merchandise.

12. It is a public place by destination, being allotted to public use in the original plan of the city. Having been so destined on the original plan of the city as a public place, it can be claimed as such at any time, and is not lost by *non-user.*

13. The dedication and allotment of a piece of ground to public uses, may be made by parol, by designation on the plan of a town or city. *Beaty et als* vs. *Kurtz et als.* 6 *Peters,* 256. *City of Cincinnati* vs. *White's lessee.* 6 *Peters,* 431. 11 *Martin,* 620.

14. All public dedications must be considered with reference to the use for which they are made. Streets, or a public place in a city, require a more enlarged right over the

use of the soil than may be necessary for a highway in the country. And it is a violation of good faith to the public, and to those who acquired property in reference to the plan of a city, with a view to the enjoyment of the use thus publicly granted, to afterwards appropriate it to private uses. 6 *Peters*, 431, 57.

15. Rivers, ports, public places and levees, and all public places dedicated to public use, belong to all in common. They belong to a class of things that are out of commerce, and cannot be alienated or appropriated to private use, 1 *Domat, Liv. Prel. title* 3, *sec.* 1, 2. 3 *Partida*, 29, 7. *Ibid*, 28, 6, 9. 5 *Partida*, 5, 15. 3 *Martin*, 296.

16. The open space on which the spot of ground in question is situated, was originally dedicated to the public by the denomination of a *quai*, in the plan of the city, and has continued ever since to be a public place.

A *quai* is defined by the language of the country from whence the name is derived. "On appellee aussi *quai*, un espace resêrvé sur le rivage d'un port pour la charge et la decharge des marchandizes." *Le Dictionaire des Arts et des Sciences. Paris*, 1731.

17. This court has already recognized the doctrine, "that public places, such as roads and streets, cannot be appropriated to private uses;" and "if by a stretch of arbitrary power, the preceding government," meaning the Spanish or French monarchs, "had given away such places to individuals, such grants would be declared void." *Mayor et als* vs. *Metzinger.* 3 *Martin*, 393.

*Mazureau*, for the appellees, contended:

1. That the space of ground under consideration, and which the counsel for the corporation and the plan of the city calls a *quai*, is not a *quai*, but is formed by nature, while *quais* are the works of man. That on rivers and in cities, they are levees; in the sea ports the shores of the sea are called *quais. Dictionaire Feraud* and *De Verger, Verbo quai. Traité de la Police de Paris*, 97, 98, 99, 102. *Lois de St. Do-*

*Margin note:* EASTERN DIS. *February,* 1833. DE ARMAS ET AL. *vs.* MAYOR, ETC. OF NEW-ORLEANS.

EASTERN DIS.
February, 1833.

DE ARMAS
ET AL.
vs.
MAYOR, ETC. OF
NEW-ORLEANS.

*minque,* 2 *vol.* 725.    3 *ibid,* 447, 763.    4 *ibid,* 771, 791.    5 *ibid,* 473, 651.    6 *ibid,* 57, 290, 526, 528, 568.

2. In France, no corporation or community of town or city could exist without the king's letters patent. *Maxims du Droit Français, p.* 58.    *Régle,* 13.

3. The cities, towns villages, &c. had property or right of use without title.    62 *Guyot's Rep. p.* 455, 456, 457, 459.

4. Possession was never sufficient to acquire commons, or right of use to the inhabitants of a city or town, even when it was incorporated.    *Coutume de Paris,* 403.    13 *Guyot's Rep. p.* 309.

5. Under the Spanish government, towns had no property without title.    3 *Part. title* 28, *l.* 9.

6. In France the king could dispose of the public places or things.    *Vattel, sec.* 295, 261.

*Maximes du Droit Français,* 1 and 2.

The first maxim is, "The king of France holds his kingdom from God and his sword."

The second is—"*Se veut le Roi, si veut le loi:* as the king wills, so wills the law."

*Quœ vult rex fieri sanctœ sunt consonœ legi.*

7. The king of Spain could dispose of or alienate even streets, public squares, &c. 3 *Part. title* 32, *l.* 3.

8. In France *quais* could be built upon; were susceptible of ownership by individuals, and the king could dispose of them as he pleased.    2 *Valin,* 453, 468.    *Traité de la Police,* 97, 98, 99.

9. The space in front of the city of New-Orleans, and which is called the *quai,* has ever been considered a part of the king's domain; (*domaine de l'Etat.*)    *Vide plan of* 1728. It was so considered under the Western Company; under the government of Spain, and by grants to Lioteau, Metzinger, Magnon, and to the plaintiffs' vendors.    *Regulations of Morales, art.* 35, 1799.

10. The plaintiffs in this cause derive their title to the premises from the United States, under the treaty of cession.

According to the laws of France, when Louisiana belonged to that nation, and up to the year 1790, all property of every

Eastern Dis.
*February*, 1833.

DE ARMAS
ET AL.
*vs.*
MAYOR, ETC. OF
NEW-ORLEANS.

description which composed the *petites domaines* was alienable. 2 *Denisart*, 120, *no.* 5.

Quais made a part of the *petites domaines.* 20 *Rep. Univ.* 78. 3 *Merlin's Rep.* 846. *Verbo domaine public.* The *Domaine Royale*, generally speaking, was inalienable. It could be alienated with a condition that the king should have the right to take it back on reimbursing the price. 2 *Rep. Univ. Verbo alienation.*

11. I conclude that according to the Roman and Spanish laws, public squares and streets could be built upon by individuals, if they had a concession to that effect from the king, or from the council to whom it belonged. This is a clear and positive proof that things destined for public uses could be applied to the exclusive use of individuals. When any man does any work, erects any buildings on property belonging to the *fisc*, nobody has a right to prevent it.

12. The United States alone can interfere with our title. They had a right to sell the premises. They alone have the power to contest the validity of our grant. Whether the president had or had not the right to issue our patent, the defendants showing no title, have nothing to do with the property we claim. They have no authority or superintendence over the acts and conduct of the chief magistrate of the Union.

In this case, MARTIN, J. dissenting, the judges delivered their opinions *seriatim.*

MARTIN, J.

The defendants are appellants from a judgment of the court of the first district, by which the plaintiffs have recovered a lot of ground in the city of New-Orleans. Their counsel has, in my opinion, justly called this the most important cause which has ever been presented to the consideration of this court. The tract of land, or slip of ground, on the legal character of which we have to pronounce, and of which the *locus in quo* constitutes a very inconsiderable part, covering the whole space in front of this flourishing city, which

19

EASTERN DIS.
February, 1833.

DE ARMAS
ET AL.
vs.
MAYOR, ETC. OF
NEW-ORLEANS.

separates the first row of houses from the levee, along the Mississippi.

The counsel of the appellees contends, that the whole of this ground is vacant or waste land, unappropriated, as yet, to any particular use, and liable to be disposed of by the United States, on gratuitous or onerous alienation; the people of this state having, as a condition of an earlier admission into the union, renounced their rights to the vacant or unappropriated lands in Louisiana, in favor of the United States.

The counsel of the appellants have, on the contrary, contended, that this whole space is their property. Secondly, that it is a *locus publicus* dedicated to the quadruple purpose of the pleasure and comfort of the public; the convenience of commerce in lading and unlading; the continuation through the city along the levee, of the highway, (which on the whole island on which the city stands,) runs on the banks of the river; and of a public street along the front row of houses. The counsel has further urged, that if the United States ever had any right or title to the premises, it has never been legally transferred to the appellees.

As, in my opinion, the appellees have shown no legal title, or right of property in the premises, I have not considered the first plea.

The only questions, therefore, which we are called on to solve, relate: First, to the legal character of the premises. Secondly, the validity of the transfer under which the appellees ground their title.

1. On the first point, the appellants offered in evidence: First—A manuscript copy of a plan of the city, subscribed by Dupauger.

2. A like copy of a plan which is now in print and engraved on the large map of the city, lately published by Francis B. Ogden; the date of the original plan is May 15, 1728, and purports to be subscribed by Broutin, an engineer, whose signature is authenticated by several superior officers.

3. A printed copy of the plan of the city, in Charlevoix's history of New France.

The two manuscript copies are admitted to have been on the original plans preserved in an office of the department of colonial affairs, at Versailles, in which plans of towns, fortifications, &c. were deposited.

The signature of Dupauger is neither proven nor admitted; but his official capacity is admitted. Charlevoix, in his history of New France, informs us there was an engineer of a high grade of that name in Louisiana, who made and showed him a plan of the city. When we compare all these plans with the existing state of the city; the number, width, length and bearing of the streets; the number and size of the squares and lots; the actual *loci publici*, they establish by the *evidentia rei* the correctness of the original plans on which these two copies were made.

There is no difference between these plans and that preserved by Charlevoix, except that the latter has but four front streets parallel to the river, while the former has seven. Hence the counsel for the appellees has contended, that no reliance can safely be placed on the evidence resulting from these plans. He assumes that the date of the latter is in the year 1744; that being the period of the publication of Charlevoix; at least, of the edition produced in court. Whatever be the date of the copy, it is clear the original from which it was taken, appears to be of a date not much less ancient than the two other plans. In Charlevoix's copy, the residence of the Ursuline Nuns, is marked at the north corner of Chartres and Bienville streets; and the new convent appears as an unfinished building at the eastern corner of Condé and Ursuline streets.

The editor of the *Lettres Edifiantes*, has preserved the copy of one from father Petit, the provincial superior of the Jesuits in Louisiana, giving an account of the Natchez massacre, and of the charity and hospitality of the nuns in regard to distressed persons of their sex from that part of the province, who escaped from that disaster; and he says the holy sisters deplored the restraint imposed on their hospitality, by the circumstance of their new house *below* the city not being, as yet, fit for their reception. The presumption is strong, that this

EASTERN DIS.
February, 1833.
═══════════
DE ARMAS
AT AL.
vs.
MAYOR, ETC. OF
NEW-ORLEANS. did not long continue to be the case, and that the plan of which Charlevoix had a copy, was made before their removal. The circumstance of the latter plan having but four streets parallel to the river, while the former had seven, shows, manifestly, that the one exhibited the *intended*, and the other the actual state of the city.

All these plans, however, agree as to the portion of the city now under our consideration; that fronting the river. In all of them, the space which separates the front of the lots from the levee, or embankment, which protects the city against the overflow of the Mississippi, is designated by the word *quai*, written on the plan, from those objects at places equi-distant. The counsel for the appellants, has argued, that this evidently shows what would otherwise appear from a view or examination of the whole plan, viz: That this space was designated by the founder of the city to be appropriated to the use, not only of the inhabitants of the city, but that of those of other parts of the state, and even strangers: That this designation sufficed to render the spot a *locus publicus*, or public place, to the use of which the public became entitled, without any grant from the sovereign, as the public cannot have a representative capable of accepting the grant.

This principle is shown to have undergone discussion, and received considerable illustration in the Supreme Court of the United States, at its last term, in the case of the *City of Cincinnati* vs. *White's lessee*, 6 *Peters*.

The defendant, in that case, had succeeded to the rights of the original owner of the land, (on which the city of Cincinnati now stands,) who had made a plan of that city, on which the ground lying between Front-street and the Ohio, was set apart as a common, for the use and benefit of the town. In his said capacity, the defendant claimed a portion of ground included in this space. The Supreme Court held, "that the right of the public to use this space, must rest on the same principles as that of using the streets and highways. That dedications of land for public purposes, had frequently come under the consideration of the court, and the objections

which had generally been raised against their validity, had been the want of a grantee competent to take the title, as well as a grantor to give it. But that was not the light in which the court had considered such dedication to public uses. The law applies to it those rules adapted to the nature and circumstances of the case, and to carry into execution the intention and object of the grantor, and to secure to the public the benefit held out and expected to be derived from and enjoyed by the dedication. That there was no particular form or ceremony necessary in the dedication of land to public uses, and that all that was required, was the assent of the owner of the land, and the fact of its being used for the public purpose intended by the appropriation.

"That all dedications of land to public use, must be considered with regard to the use for which they were made; and streets in a town, or city, may require a more enlarged right over the use of the land, in order to carry into effect the purposes intended, than may be 'necessary in an appropriation for a highway in the country; but the principle, so far as regards the right of the original owner to disturb the use, must rest on the same ground in both cases; and applies equally to the dedication of the common as to the streets. It was for the public use, and the convenience and accommodation of the inhabitants of Cincinnati, and doubtless greatly enhanced the value of the private property adjoining the common, and thereby compensated the owners for the land thrown out as public grounds.

" After being thus set apart for public use, and enjoyed as such, and private and individual rights acquired with reference to it, the law considers it in the nature of an *estoppel in pais*, which precludes the original owner from revoking such dedication. It would be a violation of good faith to the public, and to those who have acquired private property, with a view to the enjoyment of the use thus publicly granted it."

A similar decision is shown to have been made in the highest Spanish tribunal in Louisiana, in 1798. Gravier had laid out his plantation adjoining New-Orleans, into a

*Margin note:* EASTERN DIS. *February*, 1833.

DE ARMAS ET AL. *vs.* MAYOR, ETC. OF NEW-ORLEANS.

EASTERN DIS.
February, 1833.
══════════
DE ARMAS
ET AL.
vs.
MAYOR, ETC. OF
NEW-ORLEANS.

faubourg, in the plan of which he had designated a spot as a public square, and disposed of several lots accordingly. His heir imagining, that as no deed had been given for this square, it still constituted part of the estate; he, therefore, began to erect buildings on it. His pretensions were opposed, and by a decree which intervened, it was ordered, that the square should be left free for the public use, and that the buildings he had begun to erect should be demolished. *See Mayor et als* vs. *Gravier*, 11 *Martin*, 625.

The counsel for the appellees, has relied on several propositions. I have examined them most minutely, on account of the impression they appear to have made on the majority of the court.

1. The first is, that the space which the appellants' counsel, and the plans of the city call a quay, *is not* a quay; but is formed by nature, while quays are works of man. That on rivers, and in cities, they are the levees; in the sea ports, the shores of the sea are called *quays*.

He has referred us to *Feraud's* and *De Verger's Dictionaries. Traité de la Police de Paris*, 97, 98, 99, 102. *Lois de St. Dominique, vol.* 2, 725. 3 *ibid*, 447, 763. 4 *ibid*, 771, 791. 5 *idem*, 473, 651. 6 *idem*, 58, 290, 526, 528, 568.

*Feraud* says, a quay is a levee made between the river, or water of a port, and the houses, for the convenience of the highway, and to guard against the overflow, or high water.

*De Verger* says, it is a large sloping wall built on piles, and raised along the river, to keep the ground from caving in, and to prevent the overflow. In a city, it is a levee between the river and the houses, for the commodiousness of the highway; the shores of a sea port which serve for lading and unlading merchandise.

In the *Traité de la Police de Paris*, at the places to which reference is made, I have not been able to find any thing tending to the elucidation of this proposition. I have, however, considered all the quotations in the examination of the ninth proposition.

In the laws of *St. Dominique, vol.* 2, is an ordinance, authorising an individual to make before his house *a quay* and a

Eastern Dis.
February, 1833.

DE ARMAS
ET AL.
vs.
MAYOR, ETC. OF
NEW-ORLEANS.

*chaussée*, leaving before the house a vacant space of one hundred and fifty feet; guarding the *chaussée* by a double row of picquets.

In volume 3, page 477, I find nothing but an ordinance directing a quay to be kept clear and unincumbered. In the same volume, page 675, a quay is directed to be built ninety feet in width. In volume 4, page 771, another quay is ordered to be built one hundred and twenty feet in width. In page 791, of the same volume, the importance of a quay for the city of Port-au-Prince, is spoken of. It is to be spacious and commodious for the use and comfort of the public; and is to be filled up and levelled. In volume 5, page 473, a quay for the city of the Cape, is projected for the comfort of the city, and the convenience of commerce. A space is to be left before the houses for military evolutions. In the same volume, page 661, a quay for another city is mentioned. It is said a wide space is indispensable between the houses and the river; as the want of it may, in the case of conflagration, facilitate the spreading of the flames.

I find nothing in the sixth volume that throws any light on this part of the case, except a permission granted by one of the governors of St. Domingo, *par grace* out of commisseration, to erect on the quay a frame building thirty or forty feet square, under the charge of demolishing it on the first order, without claim to any indemnification. *Ibid*, 528.

I have risen from the examination of these authorities, cited in support of the proposition, with the impression, that they do not establish it, but rather the converse. I entered on the examination with the supposition, that the word quay, is particularly applicable to that part of a port (on the sea or a river,) which is used for the reception of merchandise imported, or to be exported; and this impression has neither been effaced or weakened.

In the *Dictionaire de Trevoux*, we have the following definition of the word quay. In marine phrase, it is a space on the shore of a port for the loading and unloading of goods; *agger ad ripam.*

EASTERN DIS.
February, 1833.

DE ARMAS
ET AL.
vs.
MAYOR, ETC. OF
NEW-ORLEANS.

In the *Dictionaire de l'Acadumie,* edition of 1798, it is said, we call a quay a shore of a sea port, which serves for the lading and unlading of merchandise. There is in ports an officer called *maitré du quai,* who has charge of the police of the port.

*Boiste,* in his *Dictionaire,* edition of 1829, defines a port to be a place for the reception of vessels, in which they are protected from storms. He understands also, by the same word, *a place* on the shore of the sea, or on the bank of a river, where they unload merchandise. Thus far Lexicographers. But courts of justice are warned by law not to adhere to the strict grammatical sense of words, but seek their popular sense. In the first quotation from the laws of St. Dominique, a *chaussée* and a *quai,* are spoken of as two distinct objects; the former meaning the one immediately on the water, against the attrition of which, it is to be protected by a double row of picquets. The quay, by which I understand the place destined for the reception of merchandise, is to be between the *chaussée* and the open space of one hundred and fifty feet, which is to be left open between it and the first row of houses. I take *levee* and *chaussée* to be synonimous terms.

*Chaussée,* a levee of earth, which is made along the stream to retain the water of a river or pond. A levee, which is made in low, wet and swampy places to serve as a road or way: to make a *chaussée* in a swamp. *Dictionaire de l'Académie Française.*

*Levee,* a mass of earth or masonry raised above the ground to form a road and retain the water. *Idem.*

The word *quay,* like many others, has several significations. In a strict sense it may be confined to a sloping wall. In another to the part of the port destined to the reception of merchandise. In a more enlarged sense it designates the whole space which separates the first row of houses of a city from the sea or river. It is in this last sense that *Malte Brun* applies it to the quay of St. Petersburg; the quay which separates the emperor's winter palace from the river.

" The granite *quay* in front of the emperor's winter palace, *separating it from* the river, and forming part of the magni-

EASTERN DIS.
*February*, 1833.

DE ARMAS
ET AL.
*vs.*
MAYOR, ETC. OF
NEW-ORLEANS.

ficent one which I have elsewhere described, and which extends along the southern bank, is wider here than in any other place I have seen. *Edinburgh Review, p.* 412. Notice of works published by Wells & Lilly, Boston, particularly of Malte Brun's geography.

It is in the same sense that the word *quay* is used in our *Civil Code*, 449. " Common property, to the use of which all the inhabitants of a city, and even strangers are entitled in common; such as the streets, the public walks, *places publiques*, and the *quais*."

It is evidently in that sense that Dupauger, in his plan, applies it to the space which separates the first row of houses from the levee, although that space was intended to include a street along the houses; a place destined to the landing of merchandise, and a continuation of the highway or royal road along the Mississippi; giving to the whole the appellation of the most prominent part, to wit: a place for the reception of merchandise.

During the discussion, an argument was attempted to be drawn against the conclusion I have adopted, from the very great extent of this vacant space. The city of New-Orleans stands on a place before which the Mississippi makes a very great curve; the base being that of the first lots, was drawn at a distance of about one hundred and thirty feet from the river in the middle of the city, and of about three hundred feet at the extremities above and below. In the middle, the space was barely sufficient for the purposes above specified; especially if we compare it with the space directed to be left vacant in cities on the island of St. Domingo; certainly not to be compared with New-Orleans as to the importance which their destination attaches to them.

The city forms a parallelogram; all the sides of which, with the exception of that towards the water, were completely closed by fortifications; the streets parallel to the river had no issue, but were stopped by the fortifications on each side. Those which are perpendicular were equally closed by fortifications in the rear, (except one of them which had a gate leading to the bayou road;) the only other issue or outlet,

EASTERN DIS.
February, 1833.

DE ARMAS
ET AL.
vs.
MAYOR, ETC. OF
NEW-ORLEANS. was on the space, the nature of which we are considering. So that a grant of the whole of that space to an individual or individuals, would obstruct every avenue to the city, save the small gate-way in the rear; thus making New-Orleans a large penitentiary. The streets were very narrow, being but forty feet wide, leaving the city with but a single square—the *place d'armes*, or *campus martius*, the property of the sovereign, the two sides of which were covered with barrels, besides a very small square between the cathedral church and Royal-street, which has lately been widened at the expense of the city, and to which, in remembrance of a late venerated pastor, the name of Father Antoine's square has been given. So that the city is without any space but the streets for air, promenade, or the reception of goods or furniture in case of a conflagration, except this *quai*, or open space fronting to the river.

Moreau Lislet, a witness examined in the cause says: "That in all cities or towns situated on the sea shore, or the banks of navigable rivers, a vacant space between the sea shore, or the banks of the river, and the first line of houses, front to the sea shore or the river. That this space is of a certain extent in width, greater or less, according to the importance of the place, or of its commerce. That in Paris the quays are very extensive; and in Bordeaux the quays are nearly of the same extent in width which exists between the river Mississippi and the front of the cathedral church, in New-Orleans. That at Cape Français and Port-au-Prince, in the island of Hispaniola, the quays were from sixty to one hundred and twenty French feet from the sea shore to the first line of houses. That generally, the quays in all their extent were left for the public use; but that it was sometimes permitted, or suffered by the king's government, or by the municipal authorities of the place, to erect some buildings, either for public utility or commerce, or ornament of the city or port; such as market houses, fountains, coffee houses and public baths."

In the city of Natchez, a much larger space was left vacant between the houses and the river, than in New-Orleans.

EASTERN DIS.
*February*, 1833.

DE ARMAS
ET AL.
*vs.*
MAYOR, ETC. OF
NEW-ORLEANS.

The former city being without any authentic plan, or evidence that this place had ever been dedicated to public purposes, the justice of congress came to its aid. By act passed April 21, 1806, the United States ceded all their right to the land lying between the front street of the city of Natchez and the Mississippi river, and forever vested it in the corporation of the city, so as not to affect the legal or equitable claims of individuals, and directed that the said land be neither cultivated, nor occupied by buildings, but that it be planted with trees, and preserved as a common, for the use, comfort and health of the inhabitants of the said city, and all persons who may occasionally resort thither." *See Ingersoll's Digest.* This is clearly making it a *locus publicus.*

When I compare the space that Dupauger calls a quay, with Malte Brun's description of St. Petersburg, with that which Moreau Lislet has given of the quays in Paris and Bordeaux, Cape Français and Port-au-Prince, with the ideas that my mind has received from the examination of the laws of St. Domingo, cited by the appellees, I cannot resist the conclusion, that Dupauger meant by his plan, to convey the idea of a dedication to public uses, of the whole space under consideration. He appears to have considered the levee and quay, as distinct objects, as they are in the laws of St. Domingo, for he writes the word *quai*, twice, at equal distances from the levee and the houses.

A plan, like a literal document, may on a first view present ambiguous ideas. In such cases the lines of the one, and the words of the other, are susceptible of construction and interpretation, according to settled rules, the principal of which is, that every part of each should have some effect, and none absolutely rejected. In the plan before us, the word *quai* is twice written; evidence of the destination given to a space of ground. If the word had not been used, it appears to me the space being an open one in front of the city, to which every street perpendicular to the river leads, the plan would still present the same evidence.

As the appellees claim under the United States, who have succeeded to the rights of Spain and France, they must be

EASTERN DIS.
February, 1833.

DE ARMAS
ET AL.
vs.
MAYOR, ETC. OF
NEW-ORLEANS.

*estopped* by the word quay, used by the officer whom the government of France employed to make the plan.

If the appellees are not *estopped* by the word quay, it appears to me all the streets in the city, being perpendicular to the levee leading to this space, and a spot being marked by the plan, upon and over the levee opposite to each street, the conviction is irresistible, that the founder of the city intended that space under consideration, to constitute a part of the city and connect it with the river. It has been said that this conclusion may exist by a prolongation of these streets, over that space to the river, and their intersection by the highway along the river and a street parallel to it along the first houses, will leave angular squares at the disposal of the United States. To this I answer, that this court is bound to support the dedication to the extent to which it was made, not to that degree which we might deem sufficient. We sit here to carry agreements into effect, as they appear to have been made, and not to make them. If any part of the space was dedicated to the use of the public, the whole was, and no part can be pointed out as excepted from the dedication.

2, 3, 4 and 5. The next four propositions are, that in France no corporation or community of town or city, could exist without the king's letters patent.

The cities, towns or villages, had no property or right of use, without title.

Possession was insufficient to acquire commons or right of use to the inhabitants of a city or town, even when it was incorporated.

Under the Spanish government, towns had no property without title.

It has appeared to me, that neither of these propositions has any bearing on the present case, as I consider the right claimed to resist encroachments on a public place as a right not particular to the inhabitants of the city as such; nor on any property exclusively their own, but on a public place, to the enjoyment of which they are entitled, not exclusively, but in common with the inhabitants of any part of the state, or even strangers.

In this part of the case, it is all important not to confound public places, and such places as belong expressly to a city or town; the first are destined to public and general use, from which no one is excluded. A citizen or inhabitant of any city, town or parish, and even a stranger or alien, has an equal right to the use of a street, square, the quay or port of the city; to the use of part of the sea, or river on which the city or town stands, with any one that dwells or owns property therein. The right to use results from the dedication, not from any supposed necessity which is presumed to exist, that owners of lots should use the streets to reach their dwellings. If that were the case, the streets would be burdened with a servitude, in the nature of a right of way or passage; then the use of the streets would be confined to owners of creditor estates; for such is the nature of a servitude. But streets and public squares, as the Supreme Court of the United States has said, are public places free for the use of all.

The places of which a city or town has the exclusive property, and with which it may prevent any interference, by other than its inhabitants, are those which it holds by letters patent, grants, purchase, exchange, or donations, or those on which the inhabitants have a right of use. Of the first kind, are the lots on which town houses, jails and other buildings of this kind are erected, or to be erected; grounds on which the inhabitants have the right to pasture their cattle, to cut wood, dig for turf and the like. It is of this kind of places, that the law says that the city or town cannot claim thereon, any use without letters patent, or a grant, or deed. In the absence of such a document, the public, *i. e.* inhabitants of the cities, towns, parishes, even strangers cannot be prevented from using places within or near a town or city, to which the inhabitants of the city or town may pretend they have an exclusive right.

Of public places, the public may claim the use, by exhibiting evidence of a dedication to its profit, by the sovereign or *pater familias*, without any letters patent, grant or deed.

EASTERN DIS.
February, 1833.
═══════════
DE ARMAS
ET AL.
vs.
MAYOR, ETC. OF
NEW-ORLEANS.

Of places which are alleged to be the exclusive property of the town or city, or of which the exclusive right to use is claimed, letters patent, a grant or deed, must be produced; and it is of these, and these alone, that the authorities relied on by the counsel of the appellees, speak.

6. The sixth proposition is, that in France the king could dispose of the public places. The authorities relied on in support of this, are *Maxims du Droit Français*, 1 and 2. *Vattel sec.* 261.

The first maxim is, that the king of France holds his kingdom from God and his sword.

The second *si veut le roi, si veut le loi:* As the king wills, so wills the law. *Quæ vult rex fieri sanctæ sunt consonæ legi.*

Neither of these maxims sheds any light on the point under consideration. They only show that the king possesses the legislative power.

The section in Vattel, is as follows: "The nation having the free disposal of all the property belonging to it, (*sec.* 257) it may convey this right to the sovereign, and consequently confer upon him that of alienating and mortgaging the public property. But this right not being necessary to the conductor of the state, to enable him to render the people happy by his government, it has not made an express law for that purpose; it ought to be maintained, that the prince is not invested with it."

The preceding section may throw some light on the one now under consideration. It is as follows:

"SECTION 260. The prince or superior of the society, whatever he is, being naturally no more than an administrator, and not the proprietor of the state, his authority as sovereign, or the head of the nation, does not of itself give him a right to alienate or dispose of the public property. The general rule is, that the superior cannot dispose of the public property as to its substance. If the superior transfers public property, the alienation will be invalid, and may at any time be revoked by his successor, or by the nation. This is the law commonly received in France, and it was upon this principle that the duke of Sully advised Henry IV.

to resume the possession of the domain of the crown, alienated by his predecessors."

EASTERN DIS.
February, 1833.

DE ARMAS
ET AL.
vs.
MAYOR, ETC. OF
NEW-ORLEANS.

I have been at a loss to discover how the counsel of the appellees expected us to apply his quotations to the support of his proposition. They seem to show that the king of France could not sell the domain of the crown. But we are inquiring as to his power to sell *public places*. As to them, the authorities now placed before us afford no light. Those I have had recourse to, establish the converse of the proposition. They show such places are inalienable, and out of commerce of individuals.

*Domat* says, rivers, their banks, highways, are public places, which are for the use of all, according to the laws of the country. They belong to no individual, and are out of commerce; the king only regulates the use of them.

We class among public places, as out of commerce, those which are for the use of the inhabitants of a city, or other place, and in which no individual can have any right of property, as the walls, ditches or gates of a city and public squares. *Domat, vol.* 2, *lib.* 1, *tit.* 8, *sec.* 2, 3 and 16.

This author names, as not included in the domain of the king, public places, as highways, squares, and the like, which are out of the commerce of individuals, and devoted to the use of the public. For they produce no revenue, and are not reckoned among objects of property; and the rights which the public and the sovereign have therein, are of another nature than those which property gives.

As it is not alleged that the king of France alienated any part of the space under consideration, I have been unable to discover the bearing of this proposition.

The Spanish laws having been substituted to those of France, by O'Reilly, the Spanish monarch's conduct in regard to public places, must be regulated by the latter and not the former. A desire, however, that nothing to which the counsel appears to attach any importance, should remain unnoticed, has led me to the examination of this proposition.

7. The seventh proposition is, that the king of Spain might dispose of streets and public places.

EASTERN DIS.
February, 1833.

DE ARMAS
ET AL.
vs.
MAYOR, ETC. OF
NEW-ORLEANS.
In support of this proposition, we are referred to *Partida* 3, *tit.* 32, *law* 3, which is in the following words: "If a man begin to erect a new edifice in the public places or streets, or common threshing grounds of any place, without the permission of the king, or the council upon whose ground he builds it, then any one of the inhabitants may forbid him to continue the work, &c."

The counsel appears to assume, that the power allowing the erection of a building, includes the right of alienating the ground. This is certainly a *non sequitur*. We have seen that public places are inalienable, even by the sovereign, although he has the authority to regulate the use of them; and that this regulation is sometimes effected by grant and permission to erect buildings for the utility or ornament of the city.

The counsel for the appellants has drawn our attention to the gloss on the *Partida*, cited, which states that the permission cannot be granted, either by the king or the council, unless the building be for the ornament of the city. But if the quotation of the counsel for the appellees does not support his pretension, the counsel for the appellants has furnished us one which establishes the converse. It is found in *Partida* 5, 5, 15, which says, " a public place, as squares, roads, threshing grounds, rivers, and other waters, which belong to the king or the commons of a city, cannot be sold or alienated."

8. The eighth position is, that in France, quays could not be built upon, were susceptible of ownership by individuals, and the king could dispose of them as he pleased.

The authorities cited in support of it, are 2 *Valin* 453, 468. *Traité de la Police de Paris*, 88, 97, 98 and 99. *Valin* has published an ordinance regulating the duties of the *Maître du quai* of Dunkirk. This officer is directed on his evening round, to cause to be shut up *les petites maisonéttes*, which are on the quays, for the sale of brandy and other articles, so that no body may shelter himself there at night, and to prevent new ones from being built without permission.

By an ordinance of La Rochelle, which Valin has given, it is enjoined on keepers of *hotels* and *cabarets*, vendors of

tobacco, cider, beer and brandy, having houses on the quays, to shut them at night; they are forbidden to receive or permit any one to go out before daylight in the morning.

EASTERN DIS.
*February*, 1833.

DE ARMAS
ET AL.
*vs.*
MAYOR, ETC. OF
NEW-ORLEANS.

In page 98, of the *Traité de la Police de Paris*, it is said, Louis the Young, by his letters patent in the year one thousand one hundred and forty-five, granted to the inhabitants of *Grevé* and *Monreau St. Gervais*, in consideration of the sum of seventy livres, the grand square, one of the ancient markets of Paris, to be forever free of any buildings of the king, or other incumbrances.

The author adduces these letters patent, as a circumstance to establish the fact, that as early as that king's reign, the faubourg St. Denis was built, and Grevé square was a public place, and an ancient market.

The counsel for the appellants has urged, that these letters patent establish only that the king undertook for a given sum, to clear the square of a building which he had thereon.

In pages 97, 98 and 99, the counsel for the appellees shows that the king ordered buildings to be erected on the quays of the island of the palace, and those of Notre-Dame, the quay Malaquêts and the Arsenal.

The first island derives its name from the *Palais du Tournelles*, which the kings had on it. This palace was in part demolished under Charles IX., the brother of Henry III., who preceded Henry IV. on the throne of France. The author informs us, that in the beginning of this monarch's reign, this island was covered with meadows; that the king had it drained, a magnificent square and elegant streets laid out, and he covered its quays with houses. As the island was the property of the crown, his doing so was certainly no interference with any public place. *See pages* 97, 98.

By his order similar improvements were made on the other island, which was the property of the chapter of the cathedral of Paris. But we are informed he appointed commissioners to purchase the property of the island from the chapter, to whom a compensation was made therefor. *See page* 99.

21

EASTERN DIS.
*February*, 1833.
═══════════
DE ARMAS
ET AL.
*vs.*
MAYOR, ETC. OF
NEW-ORLEANS.

The same observations that were made as to the island du Palais, apply to the island Notre-Dame, after the latter became the king's property by purchase.

The quay Malaquêts was also built upon. If that quay was a public place in the city of Paris, the king regulated its use by granting permission to erect houses on some part of it, and the convenience (if any) was compensated by a rent paid to the city. As to the quay of the Arsenal, the author informs us that it was built in one thousand six hundred and four, and that several noblemen made their residence there; this, in my opinion, establishes the period at which buildings were extended to that part of the city. We should understand by being told that a particular street was built upon, that the houses were built *not on it,* but *along it.*

The ordinance of the marine directs the wharfinger when he makes his evening tour, to cause to be shut *les petites maisonettes,* the very small houses which are on the *quay* and *dykes,* in which refreshments and spirits are sold, and that none may retire in them at night, nor to suffer any new houses to be erected without permission.

This ordinance is relied on by the appellees' counsel to prove that quays are susceptible of private ownership, since they may be built upon. My mind has, from the reading of the ordinance, received the impression that it establishes the converse of the proposition. The small houses in which spirits and refreshments were sold, I take to be booths, sheds, &c., not designed for the habitation of man, but for the sale of refreshments, as the wharfinger must see that they be closed at night so that no one (which includes the owner,) may hide himself within them. He is to take care that no such house be built without permission. This implies that the soil is not susceptible of private ownership, for if it was, it could be built upon by the owner without permission.

A quay, like any other public place, is not susceptible of ownership by individuals. But on it, as we have seen, and as is the case with all other public places, certain buildings may be erected for ornament or public utility, without the permission of the prince who regulates the use of them, or

of those to whom he delegates or confides this part of his
authority. If the quays be at such a distance from the houses in the city, to which sailors and people working on them
may conveniently resort for refreshment, it is the province of him who regulates the use of the quays as public places, to determine whether some small portion of ground may not conveniently be set apart on which small buildings may be erected temporarily for that purpose, in such a manner that the public may be better accommodated by the appropriation of the ground covered by such very small houses for a place of refreshment, than by being left open.

The counsel for the appellees has next drawn our attention to an injunction in the ordinance to keepers of hotels, cabarets, and sellers of tobacco and spirits, having houses on the quays, to shut them at night, and forbidding them to receive, or suffer any one to go out therefrom during the night. *Art.* 15, *p.* 268.

This part of the ordinance does not establish that there is any hotel or cabaret on the quay; but that there are keepers of these houses who have been permitted to occupy them on the quay in the manner just considered and spoken of. The idea of hotels being built not *along* the quay, but *upon* the very quay itself, is as absurd as that of a hotel keeper who is forbidden to receive travellers or boarders after sundown, or to suffer any one of his own servants to go out before sunrise.

The counsel for the appellees, with the view to establish that quays form part of the *petit domaine*, which the king may alienate, has drawn our attention to an edict of 1708, in which he conceives quays are included as constituting a part of that domain. The words of the edict are, " *les droits sur les rivières navigables bien fonds, lits, bords, quais*," &c., literally meaning the *right to duties* on navigable rivers, their beds, banks, quays, &c.

The edict, according to my understanding, points out as objects constituting part of the *petit domaine*, the *right of duties* which the king claims on a navigable river, its bottom, bed and banks, or in a quay; not the *substance* of the river or the quay. O'Reilly transferred to the city the right of

EASTERN DIS.
*February,* 1833.

DE ARMAS
ET AL.
*vs.*
MAYOR, ETC. OF
NEW-ORLEANS.

claiming an anchorage duty on vessels lying in the Mississippi before New-Orleans, but not the river itself.

The right of demanding *quayage* or wharfage on vessels lying along the quay, or on merchandise landed and lodged on the quay, is a right which may be the object of a sale without the quay itself being sold.

The ownership of quays in La Rochelle has been attempted to be established by the testimony of Mazureau. This gentleman, who is a native of that city, says, the quays belonged to individuals. They are allowed to receive and did receive *droits du quaiage, i. e.* wharfage duties from all vessels making fast to the quays.

In an ordinance of the judge of the admiralty of La Rochelle, owners of quays *propriétaires des quais* are spoken of as well as in Valin's notes thereon. Notwithstanding all this, my researches have led me to the conclusion, that quays in that city are public places, *hors du commerce,* and not susceptible of ownership by individuals; but that the king ceded his wharfage duties, which *Merlin* informs us, are alienable to certain individuals, on the condition that they keep the quays in repair. I think it is of these owners of wharfage duties that the witness, the judge of the admiralty, and Valin, mean to speak under the appellation of proprietors of quays.

I have been led to this conclusion by the fact, that owners of quays are not known to the law, but owners of wharfage duties are; and on the following considerations.

The ordinance Valin comments upon, mentions that quays are to be kept in repair by the municipal anthorities. *Article* 20. That in ports in which individuals are appointed to receive wharfage duties, *they* and not the municipality are to keep the quays in repair. *Art.* 21. 2 *Valin,* 475.

Valin never speaks of the obligation of owners of quays to keep them in repair, nor of their right to claim wharfage. Indeed the obligation cannot be well supposed to exist; for ownership consists in the right of *utendi et abutendi,* and of putting a price at pleasure on the use of it by others. Valin

tells us, that in the port of La Rochelle, the wharfage duties belong to those who keep the quays in repair. *Ibid*, 473.

Eastern Dis.
*February*, 1833.

DE ARMAS
ET AL.
*vs.*
MAYOR, ETC. OF
NEW-ORLEANS.

The ordinance of the judge who uses the expression of *owners of quays*, purports to be made for preventing extortion in the collection of wharfage duty. And Valin uses the same expression in examining the consequences to those people of their neglect in keeping the quays in repair. The consequence is, the suspension of the right to receive wharfage duties by the *owners of quays*, until they amount to a sum suficient to pay for the repairs. He examines what is to be done if the quays are suffered to be much out of repair, so that the replacing them in the situation to be used, exceed in value the duties that may be collected during one or more years; and he concludes that proceedings must be instituted to have them condemned, to effect the repairs under penalty of the forfeiture of the right to the wharfage duty in favor of the municipality, on whom the obligation then devolves of keeping the wharves in repair.

These individuals have not the absolute property of the quays, but a qualified one; *i. e.* the right of receiving wharfage duty as a compensation for their care and expense in keeping the quays in repair, having been substituted to the rights of the sovereign, who in undertaking to keep a public place in repair, has regulated the use of it in such a manner as to subject those who avail themselves of the quays, to contribute to their repair.

I consider quays as part of a port. Every dictionary states, that in sea ports the quay is the place where merchandise is landed. Some state it is the same in ports on a river. We have seen the police of quays in France belongs to the admiralty; the only good reason for this is, that the jurisdiction of the admiralty extends over ports; and of these the quays are a part.

A port consists, not only of the land covered with water on which vessels ride at anchor, but also of dry land, on which merchandises are landed and brought to be shipped. *Mare publicum est, flumina et portus publici sunt.*

DE ARMAS
ET AL.
*vs.*
MAYOR, ETC. OF
NEW-ORLEANS.

The sea, the rivers and ports, are public; if there be not some place out of the sea or river which is the port or part of the port, wherefore are we told that the sea, rivers and *ports* are public? If the port be included in the sea or river, why, after being told that the whole, *i. e.* the sea and river are public, do they tell us that the *port*, a part of these, is so?

9. The ninth proposition is, that the space called the *quay* has ever been considered a part of the king's domain.

In this part of the case we have been referred to grants of land on that space by governor Miro, to Magnon and Metzinger; by governor Carondelet, to Loiteau, and to the land regulations published by the intendant in 1799.

But two of these grounds have been brought under the consideration of this court; that to Metzinger, and the one to Loiteau.

In the first, the present appellants failed in the proof of their principal allegation, viz: That the *locus in quo* was part of a public highway. But this court, of which I had not then the honor of being a member, fully recognized the inalienability of public places, as was contended for by the appellants. There was not then in the state any copy of the plan of New-Orleans, and the now appellants were unable to establish their case. The court, however, declared, " that public places, such as roads and streets, cannot be appropriated to private use; that this was one of those principles of public law which required not the support of much argument; that there was not any doubt, that if by a stretch of arbitrary power the preceding government had given away such places to individuals, such grants might be declared void." 3 *Martin*, 296, 303.

In Lioteau's case, the then plaintiffs labored under the inability to establish the appropriation to the public use by the founder of the city of New-Orleans, of the space which separates the first row of houses from the Mississippi. See the case of *Chabot* vs. *Blanc*, 5 *Martin*.

The appellants stated their ability to establish, that immediately after the grant murmurs had been excited, and the inalienability of any part of the space having been tena-

EASTERN DIS.
*February*, 1833.

DE ARMAS
ET AL.
*vs.*
MAYOR, ETC: OF
NEW-ORLEANS.

ciously insisted on, the governor had revoked his grant and indemnified the grantee, by the concession of a lot on one of the streets; but the court decided the testimony was inadmissible, and the witnesses were not heard.

Magnon was a ship builder, and the ship yard was between the levee and the water. The governor deeming the builder's residence near it necessary to the public service, allotted him a space of ground to live on near the yard, but on the opposite side of the levee. The question arising out of this grant was not litigated; the city agreeing to compensate Magnon for the relinquishment of his claim.

In 1799, the disposition of the public lands in Louisiana, was confided to the intendant. Morales, the then incumbent, made certain regulations; by one of which he required the claimants of lots before the city to apply for the perfection of their titles. This renewed the murmurs and excitement which the grants of the former governor had created. The matter was brought before the cabildo, on the remonstrance of the attorney-general syndic. That body was then presided by the only jurisconsult in the province, Don Nicholas Maria Vidal, auditor of war and lieutenant governor, the vacancy in the office of governor by the death of governor Gayoso, not having as yet being filled. This tribunal directed the attorney-general syndic to institute legal proceedings to prevent any title or grant being given for any part of the land between the city and the river. The intendant was no legal character, the assessor of the intendency, his official adviser, had lately died, and no successor had as yet been appointed. These circumstances induced him to decline acting then on the attorney-general syndic's application. The cabildo addressed the king on this subject, but the retro-cession of Louisiana to France happening soon after, the matter was never acted upon by the sovereign, or any of his officers in the province.

It is not pretended that any act of the French government while France possessed Louisiana, nor of the Spanish under O'Reilly and Unzaga, shows that the space of ground, the character of which is the subject of inquiry, was considered a part of the king's domain.

EASTERN DIS.
*February,* 1833.
══════════
DE ARMAS
ET AL.
*vs.*
MAYOR, ETC. OF
NEW-ORLEANS.

During that period, however, the meat, fish and vegetable markets were removed from Condé-street to the space under consideration, under a provision of one of the laws of *la Récopilación de Leyes de las Indias*, which requires all markets to be placed in cities and towns, on the sea or a river, between the houses and the water, a measure resorted to for insuring cleanliness. This was an act regulating the use of a public place, and it contributed to the profits of the city, by whom the space covered by the old markets was converted into a ball room, and continued so till very lately, when it was sold.

The levee running between the highway and the river, was a great thoroughfare, and of much resort. Sailors spread on it, especially on Sundays, their small adventures; pedlars displayed on tables and under moveable shelters a variety of wares. Galvez, about the year 1798–9, conceived the idea of relieving the latter from the daily trouble of removing their wares, tables and shelters, by permitting huts and cabins to be erected along the levee, on the ground where the highway or royal road ran, on condition that those who availed themselves of this permission should pay therefor an annual rent, the produce of which was given to the nuns for the education and support of a number of indigent or orphan girls of the city. This was certainly the legitimate exercise of the authority of regulating the use of a *public place.* In 1788, a tremendous conflagration having almost reduced the city to ashes, some of the poorer classes of inhabitants being left without houses or shelter, Miro, their governor, allowed a number of them to build cabins or huts near those of the pedlars. The ancestor of the vendors of the appellees was one of them.

Gayoso permitted similar buildings to be erected, requiring those who raised them to pay a certain rent, the proceeds of which he applied to the payment of the wages of the door-keeper of the cabildo.

Of those who availed themselves of Galvez, Miro and Gayoso's permission, it does not appear that a single one, except the vendor of the appellees, ever considered the per-mission he obtained as entitling him to a claim to the ground

EASTERN DIS.
*February*, 1833.

DE ARMAS
ET AL.
*vs.*
MAYOR, ETC. OF
NEW-ORLEANS.

on which he built.   They viewed their licenses as temporary ones, and when disinclined to pay rent they removed their light edifices, and cleared the ground which they temporarily occupied.

10. The tenth, and last proposition is, that the appellees derive their title to the premises from the United States, under the treaty of cession.

By the second article of that treaty, " all public lots and squares, &c." are included in the cession.   Public squares are thereby nominatively included among the things sold; hence the appellees' counsel concludes they were the legal objects of sale and alienation.   This, in my opinion, does not follow.

The *fifth* Partida, 5. 15. tells us that " a free man, a thing religious, sacred or holy, *a public place*, as squares in a city, &c. cannot be sold or alienated, but says there are cases in which they may; " as, where a village, or any other place, is sold with all its dependencies."   " For though the church in the village could not be separately sold, yet by selling the village, it would pass with all other things," and the sale would be valid.   But, I understand, that the new proprietor of the village would have no more right to the church, or any thing belonging thereto.   That the church would pass *cum onere.* It would continue to be a place sacred, religious and holy, *hors de commerce*, inalienable as it was in the hands of the former owner or proprietor.   Thus, highways, streets, squares, ports, and other public places in Louisiana, passed by the retro-cession to France, and by her sale, to the United States, because the property of the former, as component parts of the province.   Yet their legal character was not changed, and they remained, in the hands of the new owner, public things, *hors de commerce*, inalienable as they were before the sale and transfer; the transferee acquiring no other right thereon than that which the transferor possessed, *i. e.* that of regulating the use.

The other observations of the counsel of the appellees, on this proposition, relate to the validity of the transfer of the premises by the United States to the vendors of the appellees,

22

EASTERN DIS.
February, 1833.

DE ARMAS
ET AL.
vs.
MAYOR, ETC. OF
NEW-ORLEANS.
which forms the second branch of my inquiry, to be considered hereafter.

Upon the whole, it appears to me, that the appellees' counsel has failed to establish any of the propositions he relied on, which have any bearing on this case, viz :

1. That the space marked on the plan as separating the first row of houses in the city, is not *a quay*.

2. That the king of Spain could alienate public places.

3. That in France, quays were susceptible of ownership by individuals; and the king could dispose of them as he thought fit.

4. That under the Spanish government, the space between the houses and the river in this city, was considered part of the royal domain:—Or, that the treaty of cession supports the appellees' claim.

I therefore conclude that the decision of this part of the case, must be governed by that of the Supreme Court of the United States, in the case of the *City of Cincinnati* vs. *White's lessee.* 6 *Peters*, to which the appellants' counsel has referred us.

The applicability of that decision to this case, has, however, been contested, on the ground that, although it affords evidence of the principles on which it was determined being consonant to the common law of England, they cannot be received as evidence of this conformity to our law. I have looked in vain in the opinion of the court, for a reference or allusion to any principle peculiar to the common law of England. It has appeared to me that the case was determined on the first broad and general principles of law mentioned in the *Corpus juris civilis*, viz : *Honeste vivere*, " to act honestly;" from which is deduced the maxim of *polliciti servare fidem*—" when we have made a promise, to keep it;" and the necessary corollory *turpe est fidem fallere*—" it is shameful to disappoint expectations we have authorised."

But the consonance of the decision with the laws of Spain, is manifest by its conformity to that of the highest judicial tribunal in Louisiana, declared two years before the retrocession to France.

A farther distinction has been attempted to be made be-
tween the case in Peters, and the present. In the one, the
plan of the city of Cincinnati had been made by an indivi-
dual; in the other, the plan of New-Orleans was made by
the sovereign, who, it is said, always retains the power and
authority of regulating the use of public places, must at all
times retain that of re-modelling his plan of a city, pro-
vided he does not interfere with the rights of individuals, nor
those which he has sanctioned by a charter or letters patent.
This is not denied, in cases of a regulation of the use of
public things. But a destruction of the right, and a regula-
tion of the use of it, are very different things; and the for-
mer cannot be justified under the pretence of the latter,
where the act has none of the characteristics of one tending
to regulate, and its object is evidently the destruction of the
right.

That the Spanish governor was not considered, in Louisi-
ana, to possess the power of alienating public places, appears
to have been the opinion of the cabildos, of Vidal the au-
ditor of war, and the officer whom the king of Spain had
chosen to furnish his governor with legal advice; and we
have seen this opinion was declared to be that of this court
in Metzinger's case.

There is so little affinity between the regulation of the use
which the public is entitled to make of a public place, and
the absolute and gratuitous destruction of the right of using
it, that I cannot well comprehend how the authority or right
to destroy, is a consequence of that to regulate. Why have
the Spanish monarchs announced in the Partidas, that they
cannot sell or alienate a street, or public place or square, if
the mere alienation by them, has the effect of an instanta-
neous abolition of the legal character of such places, in order
to create *ipso facto* a removal of the place from the class of
those which are inalienable, in order to prevent the legal
prohibition from presenting an obstacle to the gratification
of the sovereign caprice?

I do not wish to be understood to say, that natural or other
events may not render a public place no longer susceptible

EASTERN DIS.
February, 1833.
═══════════
DE ARMAS
ET AL.
vs.
MAYOR, ETC. OF
NEW-ORLEANS.
of the use to which it was dedicated; nor that, when this is the case, it does not lose the legal character which the dedication and consequent use had given it. Aigues-Mortes, a town of France, remarkable as that from which St. Louis sailed, with a large army, for the holy land, during the wars of the crusades, is now at the distance of a league from the sea. Its port and quays cannot be used for the purposes to which they were once destined, and have necessarily lost the legal character, which their destination and consequent use had given them. This has been the effect of a natural event. The town of Bath, on Tar river, in North Carolina, was erected by the legislative authority, very early in the last century; towards the middle of which it had risen to some importance, and the colonial legislature sat there. The great width of the river before it, rendered the anchorage unsafe ; other circumstances combined to induce the inhabitants to remove higher up on the river, to a spot which, during the last war, became the town of Washington, the establishment of which was sanctioned by the legislature, who ordered the public buildings of the county to be built, and its court to sit there. Before the end of the century, a conflagration destroyed almost every building remaining in Bath, and soon after, the act under which the town had been established, was repealed; the heirs of the man on whose land the town had been laid off, having re-purchased all the lots. Thus, by another than a natural event, the port, quays, streets and public squares of Bath, shared the fate of the port and quays of Aigues-Mortes, i. e. they lost the legal character they had by their destination to public use, their consequent inalienability, and resumed their primitive susceptibility of ownership by individuals. I mean to say, that the liability of a public place, to such or a similar change, is not inconsistent with the legal character which its dedication and consequent use imprinted on it, nor the inability of the sovereign to destroy that character ad nutum.

In the present part of my opinion, I think it might, however, be conceded, that the authority to alienate may be deduced as a corollory, from that to regulate; because it appears to

me, in this case, there was no alienation of the premises by a sovereign authorised to regulate the use of the public place.

Eastern Dis.
February, 1833.

DE ARMAS
ET AL.
vs.
MAYOR, ETC. OF
NEW-ORLEANS.

Miro, in yielding to the solicitation of an indigent individual, who desired to be permitted to build himself a small cabin, in which he might keep from the weather the few clothes the late conflagration had spared, did not imagine he was alienating any part of the public places ! If he meant to do so, we have the declaration of this court, that it would not require much argument to convince them that they should disregard the grant of a Spanish governor, of a part of a public place. When, about four or five years afterwards, the few planks which had been nailed together, and constituted his *pequéna cabána*, had rotted, and Bertrand found it necessary to rebuild it, he did not conceive himself authorised to do so by the permission he had first obtained to build, without having this permission renewed: and the governor was so conscious of his authority to refuse his consent to a renewal, that he burthened it with the condition that the new work should not extend beyond the limits of the former. Why this caution, if the former permission was an alienation of the soil?

If the first permission was not an alienation, there is no reason to say the second was.

In one thousand eight hundred and twelve, the second house or cabin, had fallen to ruin. The materials were carried away, and this spot of ground left clear.

In that year the Territory of Orleans was erected into a member of the confederacy of the United States; and the new state became the sovereign, on whom devolved the authority to regulate the manner in which the use of public places was to be governed. It is useless to argue whether, until then, the territorial government, or that of the United States, possessed this regulating power, as no use of it was made by either of them.

If the law be as declared by the Supreme Court of the United States, in the *Cincinnati case*; and of the Spanish tribunal in the case of the *Mayor, &c.* vs. *Gravier*, in relation to the public squares in the faubourg St. Mary, that a plan, manifesting the proprietor's intention to appropriate

Eastern Dis.
February, 1833.
──────────
DE ARMAS
ET AL.
vs.
MAYOR, ETC. OF
NEW-ORLEANS.
and dedicate a part of his land to public uses, is sufficient to affix thereto the legal character of a public place; the appellants have shown such plan: the appellees, who contend that an alienation of a public place by the sovereign, divests it of its legal character, and transfers the property to the grantee, have shown no such alienation before Louisiana became a state.

As the new state acquired the capacity to regulate the use of public things within its limits, the United States, if ever they had it, lost it; and any posterior alienation by them of such a place in Louisiana, could not change its legal character.

I conclude, therefore, that the space under consideration, appearing by the plan of the city of New-Orleans, to have been appropriated to the use of the public, and having been ever occupied as such, although, in two instances, governors favored individuals with grants of part of it, this court ought to say the *locus in quo* is part of a public place, *hors de commerce*, and cannot be claimed by an individual in a civil action.

As it is my misfortune to differ, in this respect, from the opinion of a majority of this court, it becomes my duty to examine the validity of the transfer of the premises by the United States, to the vendor of the appellees.

It is best to begin this examination by bringing once more to view some of the principal facts; they are as follow.

The ancestor of the vendors of the appellees, in one thousand seven hundred and eighty-eight, presented a petition to governor Miro, stating that the house he theretofore lived in having been destroyed in the conflagration of the city of New-Orleans, he found himself without a shelter, and was desirous of building a small house opposite to Mr. Bienvenue, and solicited the governor's permission to do so; which was granted.

Six years afterwards he presented another petition to the succeeding governor, Carondelet, stating that his small house or caban, (*cabâna casita*) was rotten, and the roof so decayed that he was exposed to the loss of the few clothes he and his family had. He prayed permission to rebuild it. This was

also granted; but on the condition that the dimensions of the new house should not exceed those of the old.

In one thousand eight hundred and nine, the applicant having died, his widow laid her claim before the land commissioners of the United States, for a confirmation of title to what she called *a lot* of ground. The board state, that in their opinion, they were without authority to make any decision in the case; but expressed their belief that if congress affirmed the claim, it would be rather an act of justice than of generosity.

In one thousand eight hundred and twelve, the house being in a state of great decay, the materials of it were taken down and removed, and the ground cleared.

In one thousand eight hundred and twenty-one, the patent under which the present claim is grounded, was issued by the President of the United States.

In one thousand eight hundred and thirty, the appellees purchased the title of the widow and heirs; and one thousand eight hundred and thirty-one the present suit was instituted.

The counsel for the appellants has contended, that the patent under which the appellees claim is null and void; because it issued without authority, and it can have no legal effect or force, under the laws in pursuance of which it purports to have been issued. He has urged that the acts of congress to which the patent refers, do not relate to *urban* estates, or to lots in a city or town; that in the land laws of the United States, the word *land* has a definite and technical meaning, confined to *rural* estates. That when the laws are to be extended to *urban* estates, it is expressly and particularly done; and he has referred us to the act of congress for extending the time of payment to purchasers of public lands, in which, after granting this indulgence to purchasers, congress then makes a provision expressly, for allowing the the like time and privileges to purchasers of city and town lots. He has said, that throughout the land laws, it appears that whenever an act is intended to operate on *urban* as well as *rural* estates, an express provision is always made therefor. *See land laws,* 760, 836, 788. He has added, that the

DE ARMAS
ET AL.
*vs.*
MAYOR, ETC. OF
NEW-ORLEANS.

provisions of the acts of congress, in regard to surveying and cultivating lands, shows that city and town lots were not in the contemplation of congress.

The opinion of the executive of the United States, it has been contended, conclusively appears to have been from the period which followed the passage of the acts under consideration, that the land commissioners of the United States had no authority to pass on titles to city and town lots; such being the construction given to them by Mr. Gallatin, then at the head of the treasury department of the United States; instructions which evidently regulated the conduct of the land commissioners, by whom the appellees assert that their title was confirmed.

A decision of the Supreme Court, found in 12 *Wheaton*, 187, is invoked, in which it was determined that an authority to enter land did not include town lots; the literal meaning of the terms of the act being limited and restrained by the context; and the considerations arising out of the general system of the land laws of the United States.

2. That the act of 1818, confirms no claims to lands which are not embraced in the report of the commissioners; *i. e.* officially acted and reported on.

3. It relates only to land claimed under an incomplete French or Spanish grant or concession, warrant or order of survey; whereas, in the present case, no such document ever existed; such a document must contain a special location, or allude to one.

4. It has been contended, that by the erection of Louisiana into a sovereign state, the United States ceased to be the *parens patriæ*, the sovereign to whom belongs the right of regulating the use of *public places*.

The patent appears to be issued on the confirmation of a tract of land by the acts of 1801 and 1814. The petition states a confirmation, not by these acts, or either of them, but by the act of May 11, 1820. Without a title resulting from an act of congress, the patent cannot convey away any part of the lands of the United States; for congress alone has the disposal of them. The president can exercise in

regard to them no power that is not vested in him by law. The patent is evidence of the conveyance. Whatever the law has given passes, but no more. No effect can be given to the patent, which is a mere emanation of the law. Beyond the law no public officer can extend or limit its operations.

If this position be true, it follows that courts of justice, from whom land is claimed under a patent, may examine its conformity, or its discrepancy in regard to the law. Otherwise, justice cannot be administered.

It has never been doubted, in the courts of the United States, nor in those of any of the states, that a judicial inquiry may be instituted, tending to impeach a patent. But conflicting opinions have been entertained as to the respective powers of courts of law and courts of equity. In some of the states, a patent is considered as *prima facie* evidence of title, and open to extensive evidence to impeach its validity. By others, that the defects must appear on the face of the patent to authorise a court of law to pronounce invalidity, and that unless the defect so appear, the patent is only voidable, and recourse must be had to a court of equity. Elsewhere, it has been considered, that a court of law may inquire, whether the patent was issued without authority, or against the prohibition of a statute, or whether the state had title to the land granted.

The Supreme Court of the United States has declared that it would be extremely unreasonable to avoid a grant in any court for irregularities in the conduct of those who are appointed by government to supervise the progressive course of a title from its commencement to its confirmation on a patent. But in order to guard against this conclusion, that this doctrine would lead to closing the door against all inquiry into any matter whatever, or beyond the grants for the purpose of avoiding it, the court declares that the great principles of law and justice would be violated, if there did not exist some tribunal to which an injured party might appeal, and the means by which an elder title was acquired, might be examined, if it had been acquired by the violation of principles essential to the validity of a contract, but that a

23

EASTERN DIS.
*February,* 1833.
===============
DE ARMAS
ET AL.
*vs.*
MAYOR, ETC. OF
NEW-ORLEANS.

court of equity is the more eligible tribunal in general, for these questions, and they ought to be excluded from a court of law. The court, however, adds, cases may happen in which the grant is absolutely void, or inoperative, as when the state has no title to the thing granted, or when the officer has no authority to issue the grant. In such cases the validity of the grant is necessarily examinable in law. *Polk's lessee* vs. *Wendell et al,* 9 *Cranch,* 87. In the same case, the same court held, that a court of law may inquire whether the patent was issued without authority, or against the prohibition, or whether they still had any title. 5 *Wheaton,* 293.

As courts of equity, as distinguished from law, are unknown to the jurisprudence of Louisiana, it follows that the courts are competent to administer justice in cases in which it must be sought in other states from a court of equity.

It has, however, been urged that the Supreme Court recognises in cases they speak of, an elder title, which presupposes a less ancient one in the defendants. But our statute places all defendants in petitory actions on the same footing. " The possessor, whoever he be, must be discharged, if the plaintiff does not make his title. *Code of Practice,* 44. A mere possessor, squatted, may demand the production of a title, for it is by the strength of the title that the plaintiff must conquer.

We are, therefore, to examine the two acts of congress, which are the basis of the opinion of the register of the general land office, on the certificate of whom the president of the United States confirmed the vendors of the appellees in their title, and the one under which they themselves allege its confirmation.

The act of 1803, relates in the first section, to claims supported by a duly registered warrant, or order of survey. The present is not alleged or shown to be supported by any such document.

The second section relates to claimants having made an actual settlement with the permission of the former Spanish officers, according to the laws, usages and customs of the Spanish government on a tract of land, and having inhabited

and cultivated it before the 20th December, 1803.  In my
opinion, there appears, in the present case, no such permis-
sion, and certainly no cultivation.  A *permission to settle,* in
the laws of Louisiana, is a well known technical expression,
used to designate an incipient step in the acquisition of lands
of the domain.    The settlement is effected by clearing,
inclosing, inhabiting and cultivating the tract.  If it be on
the Mississippi, the settlement includes the making a levee
along the shore, and a road between the levee and the land.
The section under consideration requires, that besides the
permission to settle, there should be inhabiting and culti-
vating.

The commissioners to whom the claim was presented, ex-
pressed their opinion that it was not one on which they had
authority to act.  They, however, added their belief, that
the confirmation of it by congress would be an act rather of
justice than of generosity.

These gentlemen did not express the reasons which induced
the conclusion they came to; *e. i.* that they were without
authority to act on the claim.

On my first view of the case, I thought it presented an
apparent ground for their decision: the absence of any
allegation or proof of cultivation.

It is, however, my duty to consider that which is presented
by the counsel of the appellants, viz: that in the land laws
of the United States, the word *land* is restricted to *rural,*
and not extended to *urban* estate; *i. e.* city or town lots.

It appears that throughout the land laws of the United
States, whenever any provision relating to tracts of land in
the country, are intended to be extended to city or town
lots, an express clause is added for such extension.  *Acts of
Congress, May* 18, 1824; *and March* 2, 1821.  *Land Laws,*
736, 788.

The mention of surveys, locating, permission to settle, and
imperfect grants, is also incongruous when applied to a city
or town lot.    Its situation, dimensions, the bearing and
length of its lines are established by the plan of the city or
town in such a manner as to require no survey.   A patent

EASTERN DIS.
February, 1833.

DE ARMAS
ET AL.
vs.
MAYOR, ETC. OF
NEW-ORLEANS.

may describe it without any survey or location. If it be granted, the grant is generally a complete one. There are no incipient or intermediate steps to be taken to complete the conveyance. No permission to settle; no return of any process verbal of putting into possession; no plat to be filed before the grant is finally issued.

These observations are cogent and supported by evidence, in the conclusion to which they lead; having been adopted by the executive of the United States, as appears by the instructions of Mr. Gallatin, secretary of the treasury, to the clerk of the land commissioners, dated August 6, 1811. He says: " I consider also the decisions on town lots where the title was not complete, as altogether out of the jurisdiction of the board; since one of the essential conditions was that of not only *inhabiting* but *cultivating*, an expression intended and applicable only to farms or country tracts."

In addition to this, a decision of the Supreme Court of the United States dispels any doubt that might remain. This tribunal has held, that an authority to enter lands, did not include city or town lots. They said the literal meaning of the terms of the act was restrained and limited by the context, and by considerations arising out of the general system of land laws of the United States, into which this act is ingrafted. 5 *Wheaton*, 589.

I leave the examination of the first act of congress recited in the patent, with the reflection, that I am unable to see how it can avail the appellees.

The act of 1814, is the one next mentioned in the patent. This renders it necessary I should examine it, although the appellees' ground the confirmation of their claim upon another act, viz: that of 1820.

To the act of 1814 is applicable every thing which I have observed with regard to the limitations and restraints of which the word *land*, in the land laws of the United States, is succeptible. I might, therefore, dismiss the consideration of the act with this further observation, that it cannot be correctly extended to a city or town lot.

Supposing, however, that my conclusion in this respect is erroneous, I am to inquire what claims this act confirms. They are:

1. Those embraced in the commissioners' report.

2. Those which are supported by an incomplete French or Spanish grant, warrant, or order of survey, granted prior to the 20th of December, 1803.

3. The grant must contain a special location; or the tract must have been located and surveyed by a French or Spanish officer before that day. All this must appear by the report of the land commissioners.

It is not pretended that there was any warrant or order of survey, nor any survey whatever of the premises.

There must, therefore, be a grant. A grant of what? Necessarily of land. Did the ancestor of the vendors of the appellees apply to Miro for the grant of a tract of land, or even of a city lot?. If the appellees answer that the application related to a lot, they must show that some part of the space between the houses and the stream, had ever been divided into lots. This they cannot do.

The application was for leave to build a small house or cabin, that might afford a shelter to an indigent sufferer, whose misfortune entitled him to commisseration and relief. The governor wrote " *as is requested*," and signed.

The application and permission of Carondelet, are of the same nature.

Here I am unable to see, even an imperfect grant. An imperfect grant, is one which is intended to have, but has not yet received its perfection. But this permission, though it might be continued, does not appear to have been intended to refer to a grant of land. A grant of land differs much from a permission to inhabit.

But the act of congress has another requisite. The grant must contain an actual *location*, or the tract must have been actually located or surveyed before the twentieth of December, one thousand eight hundred and three.

What is called Miro's grant, consists of the words " *as is requested*." The petition at the foot of which they are written,

EASTERN DIS.
February, 1833.

DE ARMAS
ET AL.
vs.
MAYOR, ETC. OF
NEW-ORLEANS

does not apprise us where the poor man wished to erect his hut, except that it was opposite to Bienvenu's house. Let it be assumed that Bienvenu's house was in front of the city. In the part of the city where the appellees contend the *locus in quo* is situated, the curve of the river leaves a distance of about two hundred feet between the first row of houses and the levee. A small cabin may be supposed to be twenty feet square; if so, five such cabins might stand opposite Bienvenu's house, between it and the levee; so the spot to be covered by the cabin was not *actually* located in the grant.

The counsel of the appellants has further contended, that the claim is not embraced in the report of the land commissioners. The act certainly meant an *official* report, *i. e.* one made under the sanction of an oath of office, a report made in a case in which the commissioners believed it their duty to bestow their care and attention, as officers of government.

If these gentlemen, the president and the Supreme Court of the United States, did not err, it is my duty to say, and believing they did not err, I must say the claim was one of which the board had not legal cognizance, and their report was not an official act. In other words, it was not such a report as the act under consideration refers to.

Were I of a different opinion, I should perhaps think that the commissioners, having expressed their opinion, that the claim was one over which they had no authority to make a decision, the claim was thereby officially dismissed from the consideration of the board; and that after this, any opinion which these gentlemen might be pleased to express, to soothe the disappointment of an applicant whose claim was dismissed, could not be considered as the expression of any official opinion of the board.

These reflections force upon me the conclusion, that the claim of the vendors of the appellees was not confirmed by either of the acts of congress, mentioned in the patent.

This brings me to the inquiry, whether it was confirmed by the act of May eleventh, one thousand eight hundred and twenty, as is averred in the petition.

EASTERN DIS.
*February*, 1833.

DE ARMAS
ET AL.
*vs.*
MAYOR, ETC. OF
NEW-ORLEANS.

The first section of that act, is the only part of it under which any claim to a confirmation can be based. It is in the following words: "*Be it enacted, &c.* That the claims for land within the eastern district of the State of Louisiana, described by the register and receiver of the said district, in their report to the commissioner of the general land office, bearing date the twentieth day of November, one thousand eight hundred and sixteen, and recommended in the said report for confirmation, be, and the same are hereby confirmed against any claim on the part of the United States."

Had the president stated, in the patent, that the claim had been confirmed by this act, the question would arise, whether this circumstance could dispense the appellees from administering proof of the claim coming within the provisions of the act.

This proof has not been administered, and as the law is the same, *non apparentibus et non existentibus,* I must say that the claim is not confirmed by this last act.

The claim being unconfirmed, it follows, the United States are still owners of the *locus in quo,* (if they ever were) and that the appellees have acquired no title under the patent.

The action is a petitory one, on which the plaintiffs cannot succeed, except on the strength of their own title, and they cannot avail themselves of the weakness of that of their adversary; no, not even in the absence of any title but the right which possession gives. This principle has come to us from the Roman law. *Actore non probante absolvitur reus.* It has been engrafted from the common law of England, into the jurisprudence of every other state of the Union. If the plaintiff does not make out his own case, he must be non-suited. Our own legislature has made it, with us a textual provision, "in an action of revendication, if the plaintiff does not make out his title, the possessor, *whoever he be,* must be discharged." *Code of Practice,* 44. We have proclaimed it in numberless cases, and very lately in those of *Phillips* vs. *Flint* and *Compton* vs. *Mathews,* 3 *Louisiana Reports.* *Harper* vs. *Destrahan,* 12 *Martin,* 31. *Sassman* vs. *Aymé* and *wife,* 9 *ibid.*

EASTERN DIS.
February, 1833.

DE ARMAS
ET AL.
vs.
MAYOR, ETC. OF
NEW-ORLEANS.

267.  *Abat* vs. *Rion*, 7 *ibid.* 562.  *Hervy et al.* vs. *Russell*, 3 *N. S.* 59.  *Congregation of St. Francis* vs. *Lauve, ibid.* 62.  *Johnson et al.* vs. *Incrarity*, 4 *ibid.* 10.

On this part of the case I think the law is with the defendant.

On the plea of prescription, the appellants may, in my opinion, resist the appellees' pretensions in the name of the inhabitants of New-Orleans, as a part of the public, in the same manner as any one of them of lawful age might have done.

The public, whose right the appellants vindicate, include, not only the inhabitants of New-Orleans, but those of any other city, town or parish in the state, or even strangers.  Of the *locus in quo*, the public have had the use of the premises from the foundation of the city to this day.  If the Supreme Court of the United States, and the late Spanish tribunals, were not in error, in the cases cited, I may confidently express my humble opinion, that to the streets of New-Orleans, that wide space which Dupauger called a *quai*, and the small square behind the Cathedral, and between it and Royal street, the public need not produce any other evidence of the right to the use but the plan of the city and the subsequent use.

It would be otherwise if the appellants vindicated a right peculiar to the inhabitants of the city, for the establishment of such a right would require the production of a title.  The majority of the court are of opinion, that the city would be protected in this case by a possession of forty years. They have reckoned the possession from one thousand six hundred and nine, making to one thousand eight hundred and thirty the period of the inception of the present suit, sixty-two years, from which they deduct the possession of the vendors and their ancestor, from one thousand seven hundred and eighty-eight, to one thousand eight hundred and twelve, as twenty-four years, leaving against this possession thirty-eight years only.

EASTERN DIS.
*February,* 1833.

DE ARMAS
ET AL.
*vs.*
MAYOR, ETC. OF
NEW-ORLEANS.

I think the possession of Bertrand and his heirs had not the character which gives it the effect of interrupting the prescription.

We have the evidence of the beginning of this possession. His was not an adverse possession, any more than that of one who had leased the house of a minor from his tutor. The public have the right to a considerable space of ground dedicated to the public use. The sovereign by his officers, regulated this use as the *parens patriæ.* The guardian and administrator of public plans, after a terrible conflagration it was deemed more suitable, that a few sufferers, reduced to distress and beggary, should be relieved by being permitted to erect temporary cabins on public places, rather than by pecuniary aid, drawn from private commiseration. In one thousand eight hundred, by the retro-cession to France, the king of Spain's will, on the occupancy of the ground covered by these cabins, was determined, by his ceasing to have the capacity of regulating the use of public places in Louisiana. This capacity passed successively to France and the United States, and finally was vested in one thousand eight hundred and twelve, on the State of Louisian, before the patent under which the appellees claim was issued.

I think the judgment of the court below ought to be reversed, and that ours should be for the defendants.

PORTER, J.

This is a petitory action for a lot of ground, lying and situated between the front street of the city of New-Orleans, and the river Mississippi.

The plaintiffs are assignees of the heirs of Thomas Bertrand, deceased, who, in the year 1788, obtained from the then governor of Louisiana, permission to settle and erect a house on the *locus in quo.* After occupying the house built by him for the space of six years, it fell into decay, and he obtained leave to rebuild from the Spanish governor then in office in the colony. Bertrand continued in the possession thus conferred on him, up to the time of his death, which

24

EASTERN DIS.
February, 1833.

DE ARMAS
ET AL.
vs.
MAYOR, ETC. OF
NEW-ORLEANS.

took place in the year 1803, and that possession was maintained by his widow and heirs until 1812; in the whole, a period of twenty-four years. From some cause or other, unexplained by the evidence on record, they then left the premises. Before doing so, they had, however, filed a notice, under the act of congress, with the commissioners of the United States, claiming the lot, in virtue of the permission to settle, and settlement in conformity therewith. The commissioners reported favorably on their demand. This report was confirmed by an act of congress, and on the 17th Feb. 1821, a patent issued from the general government, to the representative of the grantee.

The patent, it was contended, does not convey a title to the premises, because it is not one of those claims which were confirmed by the act of 1814. That act, according to the argument at bar, provides only for *lands*, a term which does not include *town lots*. Without discussing whether this position might not be correct in some cases, it is deemed sufficient to remark on this now before us, that congress must be considered the best judges of what they meant by the word *lands* in the act referred to, and that, as they had a report before them, recommending the confirmation of a claim to a town lot, and did confirm *it*, it is not open to us to question their construction of a previous enactment made by them. Nor is this view of the subject in any respect impaired by the last act, limiting the confirmation *to all claims which were filed according to law, and are embraced by the report;* because nothing prevented the claimant filing her title, and asking for the decision of the commissioners of the United States, although it might be doubtful, under the law, whether it could be confirmed. Again, no one has a right to make this objection, save him who claims under the United States, or some of the governments which previously possessed Louisiana. So that we are, of necessity, compelled to examine the validity of the defendants' title.

The demand of the petitioners is resisted on two grounds: First, that the defendants have title to the premises; and, Second, that the space of ground between the front street

of the city of New-Orleans, and the river Mississippi, was designated and set apart for public purposes, and could not be the subject of private ownership.

In support of each of these means of defence, the defendants rely principally, if not solely, on a map found in the office of the Marine and the Colonies of the French government, by which it appears, that in the year 1728, a plan was made of the city of New-Orleans, by an officer holding a commission under that government. On this plan, the river Mississippi is marked with the same curve it exhibits in front of the town at this day. An open space is shown to have been left between the front street and the river; this space, opposite the centre of the city, is comparitively narrow, not more than      feet. But owing to the bend of the river, the distance between it, and the street, increases rapidly as you recede from the centre, and at each extremity of the city, it extends to six hundred feet. The representation of the ground thus left vacant, on the plan produced in evidence, is inscribed with the word *quai*.

On the first point, which presents the question of title in the city, I believe the court is unanimous. Our consultations, if I understand them right, brought us to the conclusion that it had no solid basis to rest on. But, as it is relied on as a means of defence, it becomes the duty of the members of the court, who are of opinion that the other grounds assumed by the defendants are not tenable, to explain the reasons why this pretension to title cannot be maintained. The examination of the law on this point, I think too, will be found not without its utility in another part of the case. It will serve to elucidate matters involved in the inquiry, as to the alleged destination of the *locus in quo* to public purposes.

By the laws of France, a city or town could not acquire right or title to the soil of immoveables, *or to the use of them*, without letters patent from the king. This branch of the case was elaborately discussed at the bar, and I think the plaintiffs fully sustained the position assumed by them. To the books cited, may be added *Domat*. In treating of communities, he declares, as a primary rule, that they should be

Eastern Dis.
February, 1833.

DE ARMAS
ET AL.
vs.
MAYOR, ETC. OF
NEW-ORLEANS.

established for the public good, and by order or permission of the prince. Under the title *De la puissance, des droits, et des devoirs de ceux, qui ont le gouvernement souverain*, after repeating that no one can establish communities but the king, he adds, " c'est une suite du droit de permettre les etablissemens des corps et communautés, de les permettre aussi de posseder des biens, meubles et immeubles, *pour leur usages*, et cette permission est particulierement necessaire pour la possession des immeubles, car comme ces communautés sont perpetuelles, leurs immeubles deviennent inalienables."— With some other observations not necessary to be quoted, he concludes, " Ainsi les communautés ne peuvent posseder d'immeubles, que par permission du prince; et a la charge de faire cesser ses interets et ceux des seigneurs. Et cette permission s'accorde par des lettres qu'on appelle d'amortissement." *Domat, Droit public, Liv.* 2, *tit.* 2, *sect.* 2, *Nos.* 14 & 15. *Ibid, tit.* 15, *sect.* 1, *No.* 1, *and sect.* 2, *No.* 1. *Maximes du Droit Français* 58, *regle* 13. *Guyot's Repertoire, vol.* 62, *pages* 455, 456, 457 *and* 459. *Denissart, vol.* 4, 728—755.

If the laws of Spain could affect this case, I understand their provisions, in relation to the rights of corporations to immoveable property, to be similar to those of France. *By the* 9 *law of the* 28 *title of the* 3d *Partidas*, the definition given of common property in towns or cities, is, those public places, &c. which are " *establicidos é otorgados para pro communal de cada cibdad o villa;*" established, and granted, to be common to a city or town.

An ignorance of the laws of France cannot be presumed in the government of that country. Not the slightest reason has been given, why they should have been deviated from in this instance, if the sovereign had intended to grant the space of ground between the first streets and the river, to the city. Satisfactory reasons can be assigned for making the plan, wholly adverse to the idea that it was to be a substitute for a grant. France, like all other civilised nations, was, it is highly probable, anxious to obtain, and at all times to preserve within her reach, a correct knowledge of her colonial possessions. Hence, no doubt, orders were given to her

EASTERN DIS.
*February*, 1833.

DE ARMAS
ET AL.
*vs.*
MAYOR, ETC. OF
NEW-ORLEANS.

officers on foreign stations, to make surveys of the ports and harbors, and to furnish plans of the towns, in her colonies. That produced in evidence, was made in the year 1728. It was never delivered to the city, as a muniment of title. Its existence appears to have been unknown to the corporation, until a quite recent period. It cannot be believed, that if the king intended the inscription on the document offered in evidence, should operate as a grant, that those to be benefited by it, would have been so long left in ignorance of a fact so important to them. When, to these considerations as to intention, we add another and an obvious one, that until the town had a legal existence given to it, by letters patent, there was no corporation to which, by the laws of France, the grant could be made, I think it must appear plain to all who will consider the subject, that the pretension of title set up on the part of the corporation, cannot be supported.

But it is said, though the title to the property may not be in the corporation, still the plaintiffs cannot recover. The *locus in quo* was destined to public purposes, when the town was established; that destination was irrevocable; and the property so appropriated was forever put *hors du commerce.*

Before entering on this question, I think it proper to remark, that we may dismiss from our consideration the authorities to which we have been referred at common law. For the case before us, is not as to the rights retained at common law, *by a private individual*, who designates a place for public purposes. Our inquiry must be, what were the powers *of the kings of France and Spain, under the laws of those countries*, over a place assumed to be set apart for common use, and of which, it is admitted, no grant was made to the town. If the case was to be decided by the books referred to in the former system, I am not prepared to say, the plaintiffs could recover. They certainly carry the effect of a *destination to public use*, as it is called in that jurisprudence, to a greater length than the laws of France or Spain do. Such dedication, if once made, appears to be irrevocable, so long as the public may use the object so appropriated. The decision of the Supreme Court of the United States, places the setting

CASES IN THE SUPREME COURT

EASTERN DIS.
February, 1833.
═══════════
DE ARMAS
ET AL.
vs.
MAYOR, ETC. OF
NEW-ORLEANS. off commons to cities, on the same grounds as that of streets and highways. That court finds no difficulty in the want of any person, natural or artificial, to accept the gift. It supposes the fee to be in abeyance until the town is incorporated, and the moment it becomes so, the title rests in the corporation. The learning and ability of the judges of that tribuanl, forbid the belief that they did not correctly expound and apply the rules of their jurisprudence to the case before them. I have no doubt they did. But it appears to me, the doctrine recognised by them, would require considerable limitations and modifications, before it would be conformable to the laws of France or Spain, which govern this case. One example will show this. When commons are set apart for public use, the Supreme Court considers the title in abeyance, until a grantee exists who can accept it; and even until that event takes place, the grant is irrevocable. This principle appears wholly irreconcilable with the rule of the French law, that no community can have a legal right to the use of immoveable property, without letters patent from the king; and it is equally difficult to reconcile it with that of the Spanish, which recognises no place as common property, for the use of the city, but that which it acquires by grant, purchase, or prescription. But the discrepancy between the systems, is more marked in relation to the power of the supreme authority in the state over public places; and the difference cannot fail to excite attention in this case, because it will be found to turn, in a great measure, on the extent of that power. By the common law of England, if the king once established a port, he lost the power of resumption. He could not afterwards contract its limits. So rigid was this rule, and so productive of inconvenience was it found, that an act of Parliament became necessary, to vest that authority in the crown. I am greatly mistaken, if the political institutions of France or Spain, affixed any such limits on the power of the kings of either country. Sitting here, it is not for us to inquire which system is the best; it is sufficient if they differ, and that that which supports the pretensions of the defendants is not ours. 1 *Black. Com.* 264. 6 *Pet.* 431.

While on this part of the case, it may be proper to notice an argument urged from the bar, which would seem to create some difficulty in sustaining the plaintiffs' pretensions. The ground left vacant in front of the city, was compared to the streets, and it was asked, could the sovereign, after marking them out for the use of the city, afterwards make them the object of individual ownership. The Supreme Court of the United States, in the case already cited, seem to consider any ground left vacant by the proprietor in establishing a town, as subject to all the rules which govern an appropriation of land, to streets and highways. The streets of a town are no doubt what is denominated in our law public places, and they are protected from change and alienation, by all the rules which apply to things of this description. But the power of the grantor over them, even if he should be the king, is in my opinion, much more limited, than that he possesses over other things of the same kind. So long as the town remains unincorporated, and he retains the power of regulating its police and government, by laws and ordinances, he may modify, abridge or enlarge the streets, but he cannot deprive the inhabitants of the use of them; and for an obvious reason. Streets are indispensable to the enjoyment of urban property. Without them a town could scarcely be said to exist; the inhabitants of it would be as prisoners in their own houses. It may, therefore, be readily admitted, that the sovereign power of no country could deprive the owners and occupants of lots and houses, of things indispensable to the use and enjoyment of the property sold, or conceded, without violating the plainest dictates of justice, and the general principles of law applicable to all other cases of the same kind. But its inability to do so would not proceed from their being destined to public purposes, but because without them the property granted could not be enjoyed. Just as on the same principle, an individual who granted a portion of his land which could not be reached but by passing over other portions of it, would be considered as having conceded to the grantee the right of way over the part retained. It is a well settled principle, that whenever an individual

EASTERN DIS.
February, 1833.

DE ARMAS
ET AL.
vs.
MAYOR, ETC. OF
NEW-ORLEANS.

EASTERN DIS.
*February*, 1833.

DE ARMAS
ET AL.
*vs.*
MAYOR, ETC. OF
NEW-ORLEANS.

or the law giveth any thing, there is impliedly given at the same time, whatsoever is necessary to its enjoyment. The limitation, therefore, contended for on the power of the sovereign over streets, may be well conceded to the whole extent pressed in argument, without at all affecting his authority, or his rights over vacant ground not proved to be necessary to the use of private property.

The case has been argued on the power of the crown over public places. But this presents the question in too general a shape. In my judgment the proper inquiry is, what power the sovereign, in whom the right of sale exists, has over a space of ground left vacant when the city was laid out, which was afterwards designated on a plan as a quay. But the examination of the authority in its application to any thing destined to public use, may aid us in reaching a correct result, though that result could be obtained in this particular case, without such examination.

There are two kinds of things, says Domat, destined to the common use of men, and of which every one has the enjoyment. The first are those which are so by nature; as rivers, the sea, and its shores. The second, which derive their character from the destination given them by man; such as streets, highways, churches, market houses, court houses, and other public places, and it belongs to those in whom the power of making laws and regulations in such matters is vested, (*la police,*) to select and mark out the places which are to serve the public for these different purposes." *Domat, liv.* 1, *title* 8, *sect.* 1, *art.* 1.

Admitting, therefore, that the whole space of ground left vacant between the front street of the city and the Mississippi river, was destined to common use, and that it could not be the subject of private property, a question which will be examined hereafter, I do not see how the conclusion is obtained that it is forever to remain so. If the doctrine has any foundation to rest on, it must be this, that individuals acquire a right by the dedication to public purposes paramount to that of the sovereign by whom the dedication was made, though the right of soil, and the authority to make

regulations and laws for the police of cities, were both vested EASTERN DIS-
*February*, 1833.
===

DE ARMAS
ET AL.
*vs.*
MAYOR, ETC. OF
NEW-ORLEANS. in him. This proposition I consider untenable. Reason, public convenience, and the law which governs the case, are all opposed to it. The changes which are continually produced on the surface of the earth by natural causes, and the alterations in the positions of the various societies of men who occupy it, repel such a doctrine. Places where cities once stood are now deserts. Where highways once ran, highways are no longer practicable or convenient. Turns require to be enlarged, and the public places to be changed. There is perhaps no spot on earth where the incompatibility of such a doctrine, with public convenience, and public improvement, is more manifest than in the city we live in. The river on whose banks it is placed is continually working important changes in its localities, which must be met by the labor and industry of man; and a principle of law requiring every public place to remain as it was originally designated, if we are to judge of the future from the past, would completely defeat the purposes for which that designation was first made. The same causes producing a necessity for alterations in ports, harbors, and other public places, have been in activity everywhere, though, perhaps, in a less degree than in this city and its faubourgs; and the law has provided for them. When the right to the soil, and the powers of police and city governments were united in the corporation, its legal administrators could alienate public things with the sanction of the supreme power in the state. When both were in the king, he possessed the authority without any legal restraint; and if he erred in the exercise of it, redress could only be had from him. It is true, that so long as the government preserved the destination for public use, neither the whole, nor any part of it, could be the subject of contract between individuals; and it is in this sense, I understand the various authorities referred to, which declare, that things public cannot be bought or sold. Such, it appears to me, is evidently the meaning of the passage in the Roman Digest, in which Domat lays down the general principle, that they are *hors de commerce.* " *Sed Celsus filius ait, hominem liberum scientem*

Eastern Dis.
*February,* 1833.
═══════════
DE ARMAS
ET AL.
*vs.*
MAYOR, ETC. OF
NEW-ORLEANS.
*te emere non posse, nec cujuscumque rei si scias alienationem non esse, ut sacra et religiosa loca; aut quorum commercium non sit, et publica quæ non in pecunia populi, sed in publico usu habeantur, ut est Campus Martius.*" Though the field of Mars could not be an object of commerce, I apprehend we cannot safely deduce from this passage the doctrine, that the Roman senate had not the power to dispose of the field as they thought proper. I understand the law quoted from the Partidas, in the same way; and I cannot gather from it that it was at all contemplated to limit the power of the king of Spain over public places. It merely declares, what I do not doubt is true, that so long as the thing is public, it cannot be bought or sold. Toullier tells us, that property of this kind is only inalienable so long as it preserves its destination. He further shows, that the modern law of France agrees with the ancient in respect to the rights of corporations. They cannot acquire any thing for their use without the express consent of the legislature. He divides the things of which they may become the owners into two kinds; one of which consists of public edifices, roads, streets, canals, &c. They may alienate this property by the same authority under which they can acquire, provided certain formalities are pursued. To the same effect is Domat. Among these formalities, I cannot discover that it was necessary to have a law, or ordinance passed, changing the destination, that appears to have resulted from the alienation itself if made according to law. If a corporation, with the sanction of the supreme power in the state, could dispose of things destined to public use, of which they held the title, and by this alienation change their destination, I see no ground for doubting, that the sovereign, in whom this authority to approve the sale was vested, in case the title was in the corporation, could also sell at his will and pleasure, when *the right to the soil and the power to regulate* the city, were both retained by him. This distinction between the public places of which the property was in the crown, and those which were not, appears to have been recognized by the Roman law. The edict *ne quid loco publico vel itinere fiat* we are told did not extend to things of which

Eastern Dis.
*February,* 1833.
=============
DE ARMAS
ET AL.
*vs.*
MAYOR, ETC. OF
NEW-ORLEANS.

the property was in the sovereign. Individuals had nothing to do with them, and if any one erected works on them, redress was not to be obtained from the prætor, but the prefects of the prince. The *third law* of the *thirty-second title* of the *third Partidas* makes the same distinction; for it declares that no one shall build or erect works in streets or common grounds, without permission of the king, or council, as the case may be, on whose ground he builds. *Sin otorgamiento del Rey o del concejo en cuyo suelo lo ficiesse.* Toullier *Droit civil Fran-çais,* liv. 2, title 1, chap. 3, nos. 36, 40. *Ibid,* 49, 50, 51. Domat, liv. 1, title 2, sect. 8, arts. 5, 6. *Digest, lib.* 18, title 1, *l.* 6. *Ibid,* 43, 8, 2, sec. 4. *Partidas,* 5, 5, 15. *Ibid,* 3, 32, 3.

The principles which may be gathered from the writers on public law, do not enable us to say, that any limitation existed on the power of an absolute monarch, which forbade the alienation of property, such as that which has given rise to this contest. *Grotius* and *Puffendorf* divide public property into two kinds; one they denominate *national domain,* the other the *domain of the crown.* Of the revenues of the latter, the king when he was absolute, might dispose at his will; of the former he had only the administration. Lands formed by alluvion fell into the first class; those which were left dry by a river changing its bed were considered as making a part of the revenues of the state, and subject to alienation by the king. Under which of these divisions, newly discovered lands which were occupied by savage nations, and obtained from them by conquest or purchase would fall it is somewhat difficult to say; but the inquiry is immaterial. The practice of all the European nations which have acquired dominions on this continent, has been to consider them crown property, and as such, susceptible of alienation by the sovereign. The kings of France, of Spain, and of England, have, as far as I am informed, granted and sold, and made donations of these lands without having their authority to do so ever called in question. There is scarcely a title to land in either North or South America, which is not derived from that source; and it is now by far too late to call it in question. If then, the position always assumed in relation to the right

Eastern Dis.
February, 1833.
═══════════
DE ARMAS
ET AL.
vs.
MAYOR, ETC. OF
NEW-ORLEANS.

of soil in the sovereign be true, and if it be also true, as I consider it is, that until a grant was made to the city, he had the power to alienate any portion of vacant land, not indispensable to the use and enjoyment of urban property, his authority over the *locus in quo* cannot be distingushed from that which he possessed over any other part of Louisiana. *Grotius on War and Peace, liv.* 2, *cap.* 6, *sec.* 11, 12. *Puffendorf, lib.* 8, *cap* 5, *sec.* 8, 11.

The extent of the power of the king then, under the view just taken, I think cannot be questioned, but as the argument which limits his authority over a place such as this, to acts of administration which may have public good in view, has made an impression, it requires some further notice. That the power over the *locus in quo,* as well as other powers vested in an absolute monarch, must be assumed in theory to have been surrendered to him, and should be exercised for the public good, I readily admit; but that there existed any legal limitation on the power, from which a court of justice, either in France or Spain, could pronounce a grant such as this before us null and void, is what I feel unable to assent to. We have already seen, that according to the highest authorities, land left exposed by a change in the course of a river, made a part of the domain of the crown, and was subject to alienation. The inveterate practice of the sovereigns of Europe, in relation to lands acquired on the continent has been noticed, and if any one principle can be established in relation to matters of this kind, by a concurrent usage, it may be safely affirmed now, that these lands could rightfully and legally be alienated by the crown. This right strikes me to be in no manner inconsistent with the full admission, that these lands as a part of the domain of the crown, were given to it for administration, and for revenue. The administration of waste and unsettled deserts could yield no revenue. Profit could only be derived from their sale, or their settlement. Sale in the greater number of instances was out of the question, for men in that early period, could not be found in sufficient numbers to abandon the comforts and security of elder societies, and risk their

Eastern Dis.
February, 1833.
═══════
DE ARMAS
AT AL.
vs.
MAYOR, ETC. OF
NEW-ORLEANS.

fortunes and families in distant regions, among savage nations. Strong inducements were therefore required to be held out, and these inducements were in general, gifts of land. A discretion was necessarily conferred on the government, as to the mode in which these foreign possessions might be rendered valuable to the state, and it cannot be doubted that that discretion was soundly exercised, in inviting settlers, by making them donations of land. It was the only means by which the revenues of the crown could be ultimately improved, through the commerce which the colony might have with the mother country. When, therefore, in the exercise of an authority so legitimate, and so long practised, the crown makes a grant, can a court of justice cross its path, check the bounty of the sovereign, and declare the patent void, because the discretion vested in him was not wisely exercised? I am unaware of any tribunal ever having gone such a length. The grounds offered in this case may be very good, and such as should have prevented the grant being made. It is possible they were overlooked, and overlooked through negligence, and it may be admitted the case is strong enough to call on the grantor to compensate the grantee, and revoke the grant. But the considerations on which such a conclusion could be obtained, and such a decree be made, were for the sovereign. A court could not safely enter into the one, and has no authority to declare the other. Such objections, if received, would lead to interminable inquiries, and end in the most unsatisfactory conclusions. One day the grant would be assailed on such grounds as are offered in this case; on another it would be attacked, because from the peculiar position of the property, or from increased value given to the land conceded by the settlements annexed it, it would have been wiser in the sovereign to have made it an object of sale. I know of no cases where a grant from the state can be considered void, except where the state has no title to the thing granted, or where the officer by whom the grant was made had no authority to issue it. To such cases alone do I understand the Supreme Court of the United States to confine the nullity. *Polk's lessee* vs. *Wendall*, 5

Eastern Dis.
February, 1833.

DE ARMAS
ET AL.
vs.
MAYOR, ETC. OF
NEW-ORLEANS.

*Wheaton,* 303.   In a very late case where it was contended before that tribunal, that a grant of lands in Florida was void, because the intendant had exceeded his jurisdiction, the court said "he had the power to make the grant, the terms and extent of which were within his discretion, of the proper exercise of which, we have neither the power nor right to judge."   6 *Peters,* 746.

It was said in argument, that the king could not make such a concession in this, and that still less could a colonial officer make it.   The permission to settle in the present case, was given by the governor of Louisiana.   Ever since the country was established, officers of this rank exercised the power, both under the French and Spanish governments to grant lands, and the legitimate exercise of that power cannot now be questioned.   The same objection was taken in the case decided in the Supreme Court of the United States, just alluded to, and the answer made to it expresses so fully my opinion, and in language so clear, that I shall quote it.   "The grants of colonial governors before the revolution, have always been, and yet are taken as plenary evidence of the grant itself, as well as authority to dispose of the public lands.   Its actual exercise, without any evidence of disavowal, revocation or denial by the king, and his consequent acquiescence and presumed ratification, are sufficient proof in the absence of any to the contrary (subsequent to the grant) of the royal assent, to the exercise of his perogative, by his local governors.   This, or no other court, can require proof that there exists in every government a power to dispose of its property, in the absence of any elsewhere, we are bound to presume, and consider, that it exists in the officers or tribunal, who exercise it."   6 *Peters,* 728.

The case then stands before us as if the permission to settle had been given by the king himself.   The property belonged to the crown, and as such might be alienated, unless we come to the conclusion, that although the town of New-Orleans, for whose particular benefit it was said to be set apart, could not successfully assert a right or title to the use of it, without letters patent, all mankind might.   The unwise

EASTERN DIS.
*February,* 1833.
======
DE ARMAS
ET AL.
*vs.*
MAYOR, ETC. OF
NEW-ORLEANS.

exercise of the power vested in the sovereign, does not enable a court of justice to declare that the grant is null. Resting on these postulates, I look around me in vain, for any safe ground on which the tribunal can assume the authority to decide, that the patent produced by the plaintiffs is void.

But this case may be considered on other grounds than the rights in, and power of the sovereign over public places in cities where he has not made a grant of them, and I apprehend the result of the examination will be equally favorable to the pretensions of the plaintiffs. The real question here, is, what power had the king of France over a piece of ground left vacant in front of the city of New-Orleans, when it was first laid out, which space several years after that event, was represented on a plan made by the authority of government as a quay? It cannot be made a question, that the king in laying out public places, may make an absolute or conditional gift of them, or that the right conferred on the public may not be qualified and incomplete. Equally true do I consider the proposition, that this limitation, where there is no express grant, may be sought for in the laws and usages of the country, or may result from the purposes for which the destination is made. Toullier tells us, that a destination to public purposes does not prevent the acquisition of individual rights, compatible with the use which the public has in the thing so destined. *Toullier, liv.* 2, *tit.* 1, *chap.* 3, *no.* 40. The right acquired by the plaintiffs under this grant, is not incompatible with the loading and unloading of merchandise from vessels, which is the use a quay is destined to, and the sovereign cannot be presumed to have surrendered any thing more, than that which was necessary for the enjoyment of the thing given.

The same conclusion can be obtained on other grounds. In the first place, unless we admit that words can make or change things, the *locus in quo* cannot be considered a quay or a part of one. The word *quay* in English, *quai* in French, and the corresponding terms *muelle* or *mueco,* in Spanish, are defined by the best philologists and law writers, as artificial works erected by man. No part of the ground, therefore,

EASTERN DIS.
February, 1833.

DE ARMAS
ET AL.
vs.
MAYOR, ETC. OF
NEW-ORLEANS.

left between the city and the river can be regarded as *quay*, save that which was prepared for the safe and more commodious reception and discharge of vessels, by the creation of the *levee*, or artificial embankment.

But admitting that a place found within the limits of a city, which answers the purpose of loading and unloading vessels, without labor being bestowed on it, could be considered a *quay*, still the undoubted fact, that in by far the greater number of instances, these places were artificial works, shows that it must be in the laws and usages which establish the rights of the owners in relation to *them*, that those of the owner of the soil, which in its natural state serves for a quay, must be sought. The books make no distinction, and reason suggests not even a plausible ground for any. The right and title to the soil, cannot be regarded as less valuable, than the materials and labor used in erecting a work of this description.

There is express authority in the Spanish law, in relation to the rights of those who by artificial works make a port, (and he who erects a quay, necessarily falls within the same principle) and we learn by it, that no part of the port belongs to the public, save that which is required to land, and to embark " *si el puerto de la mar fuere fabricado per ingenio de hombre el edificio es del que le fabrico conforme un texto: mas el puerto es de todos per ser el aqua commun.*" " If the port of the seas is made by the work of man, the edifice belongs to him who erects it, but the port belongs to all that the water may be common." If the edifice therefore belongs to the individual, and nothing be common but the use of the water, it is difficult to see on what ground the whole of it can be considered as destined to public purposes, when a portion of the work is sufficient for the enjoyment of that which belongs to the public. The facts found in the writers on the French laws, and the acts of that government, clearly in my opinion, sustain this distinction, and are utterly irreconcilable with the position, that all the works erected for a quay, or all the ground marked out as such is destined exclusively to the public use, and unsusceptible of private

ownership. In the year one thousand six hundred and seventy-six, commissioners under the authority of the French government, by ordinance, regulated the rights of the *proprietors* of quays in Rochelle, prescribed their duties and established the rate of tolls.

EASTERN DIS.
*February*, 1833.

DE ARMAS
ET AL.
*vs.*
MAYOR, ETC. OF
NEW-ORLEANS.

In one thousand six hundred and ninety, one thousand seven hundred and twenty, and one thousand seven hundred and fifty-nine, there are ordinances of the king of France on the same subject, recognising the ownership of individuals of such places, and furnishing rules and regulations in regard to the houses built thereon. *Valin, vol.* 2, 449 *to* 477. Various ordinances passed in relation to the city of Paris, permit or direct houses to be built on the quays within its limits. *Traité de police, liv.* 1, *tit.* 7, 102 *a* 106. If the whole of the places thus marked out as quays, were *places publiques*, common to all mankind, whence this individual ownership? and how came individuals to reside in houses erected on them? The most satisfactory explanation which can be given of such a state of things, appears to me this: that after the quay was erected, the public had a right to the enjoyment of a sufficient space of it to load and unload vessels, and the right to regulate the portion destined for their use; and that the rest being private property, the owner was permitted to appropriate it to his own advantage. If this be true, there can be no error in assuming, that when the crown made the quay, or laid it out on lands belonging to the sovereign, his rights in and authority over the place, were not inferior to those of private individuals. They were indeed greater when the city was not incorporated, because to the ownership was joined the power of making regulations for the government of public places. By edicts of Charles IX. in one thousand five hundred and sixty-six, of Louis XIV. in one thousand six hundred and seventy-two, one thousand six hundred and eighty-two, and one thousand seven hundred and eight, quays as making a part of the *Petites domaines*, were alienated, which is strong and conclusive evidence, that at that time and in the opinion of these monarchs and their advisers, it was understood that all places of this kind in

CASES IN THE SUPREME COURT

EASTERN DIS.
*February*, 1833.
DE ARMAS
ET AL.
*vs.*
MAYOR, ETC. OF
NEW-ORLEANS.

cities, did not belong to corporations, and that they might be disposed of by the king to individuals. It is contested whether the thing itself was sold, or merely the *rights* which the king had in it, but this inquiry is immaterial, if it be true that in places of this kind erected by individuals, a power existed to appropriate any portion of them to private purposes, provided sufficient space was left for the enjoyment of that part which was dedicated to the use of the public.

The case was principally, though not exclusively, argued on the laws of France, and by these laws, I have thus far considered, it should be decided. If, in the hands of that country, the ground in question belonged to the crown, it certainly passed to the king of Spain by the treaty of cession, and he owned it as it had been owned by the French monarch, unless the laws, or political regulations of the former country, changed its character, or limited the rights of the sovereign.

I have been unable to discern that any such existed. It has been already seen, by a law of the Partidas, that *a grant* was necessary, to render a place set apart for public use, common property of the city, and by another law contained in the same work, that the king might own public places in a city, because it then is a prohibition to build on those which belong to him without his consent. The regulations made in relation to the Spanish dominions in America, strengthen the conclusion that the rights of the kings were the same in both monarchies. The 4th book of the *Récopilacion de las Indias*, titles 7, 8, 9, 12 & 13, contains many minute regulations as to the manner in which cities were to be laid out in the colonies. The 1st law of the 13th title of the 4th book, has however, a very clear expression of the policy of the monarchs of Spain on this subject, and contains a direct assertion of a power, in all respects conformable to that which I consider was possessed by the kings of France. By this law, it is declared that the viceroys and governors who have authority conferred on them to lay off towns, may designate lands, for their use, and *may grant them*; but that they shall send to the king a statement of what is thus designated and given,

EASTERN DIS.
February, 1833.

DE ARMAS
ET AL.
vs.
MAYOR, ETC. OF-
NEW-ORLEANS.

in order that it may be confirmed by him.  " *Los vis-reyes y governadores que tuvieren facultad senalen a cada villa y luego que de nuevo se fundare y publare, las tierras y salares que huviere menester, y se le podran clar, sin perjuicio de tercero para propios, y enviennos de lo que a cada uno huvieren senalado, y dado, para que lo mandemos eonfirmar.*"  It results from this law, that designation alone did not vest title, for after the designation is made, power is given to grant the lands to the city; a power wholly unnecessary, if the mere fact of laying the land off for the benefit of the community, conferred an absolute right to the use of it.  The necessity of obtaining the confirmation of the king himself, before the grant or gift was complete, no doubt, proceeded from the same reason which dictated a similar policy in France, namely, that when once given, the thing was put *hors de commerce.*

The laws found in the *Récopilacion* relative to the property of towns in Spain, do not, in any respect, repeal the provisions already cited from the *Partidas,* which require title to exist in the city, before it can claim a right to the use of public places.  The only modification they introduce, so far as I have been able to discern, is, that cities might acquire by purchase or prescription.  From various enactments found in the compilation first named, it appears that rich and powerful individuals, the municipal officers, neighboring communities, and sometimes strangers, were in the habit of entering into and occupying the commons, lands, and other property, belonging to towns and communities.  In many instances, the difficulty of obtaining possession and redress, was increased by the usurpers having obtained grants of such places from the crown itself.  Several of the laws complain, that favor was shown by the courts, to the persons thus entering on the common property of the cities, and for near two hundred years, there appears to have been a constant struggle between the cupidity of individuals on the one hand, and the justice of the crown on the other, seeking to preserve to communities the property which belonged to them. *Novissima Récopilacion, liv. 7. tit. 21. laws 3, 4, 5, 6 & 7.*— The first law of the 15th title of the same book, declares it

Eastern Dis.
February, 1833.

DE ARMAS
ET AL.
vs.
MAYOR, ETC. OF
NEW-ORLEANS.

to be the will and pleasure of the king, to preserve the rights, rents and property of cities; that it was not his intention to grant them, and that if he should, such grants were not valid. The succeeding law of the same title and book, speaks of the property which belonged to cities, and makes enactments for better securing their enjoyment. The 1st law of the 21st title of the 7th book, provides for things which cities may have acquired by purchase or prescription, and declares they shall not be dispossessed of them. The next law also relates to city property, and the same remark applies to the various other provisions found throughout this book. As almost all the towns in Spain, at the time of passing these laws, had acquired a title, by prescription from long use, though they were originally without a grant, it is most probable the enactments first alluded to embraced all the community-property in old Spain. But in none of these laws, so far as I have been able to discern, is one syllable to be found respecting any other property but that belonging to cities; none of them speaks of that owned by the crown, and to which the community had no grant, or had acquired no right or title by prescription.

The prohibition contained in one of those laws, against officers, deriving their authority from the king, thereafter making grants, either of the property of cities, or of any lands whatever, without license from the crown, I am of opinion, applies to commons and public places held by communities in old Spain, under the circumstances already stated. The words of the law, indeed, authorise no other construction: *Los terminos, y proprios, y baldios de las ciudades y villas de nuestros reynos.* The property which is common to cities, we have already seen, is that which is granted to them, or which they may have acquired by purchase or prescription. Such an enactment does not apply to property in a city newly laid off, where the king has not made a grant of the public places, or the community has acquired no title by prescription. But, admitting it applied to crown property, as well as that to which towns might have acquired a right by long enjoyment, or otherwise, it cannot be understood as

limiting the authority of Spanish governors in Louisiana.
We have just as much reason for considering it not in force,
in regard to the *locus in quo*, as we have in relation to other
lands in the province, for the prohibition extends to all lands
belonging to the crown; and the conclusion that the Spanish
governors had no power to make a grant of crown property
lying within the limits of a city, in consequence of this law,
must bring us also to the same result, in regard to all the
grants of waste lands which were made by Spain, while she
possessed the territory which now forms this state. For the
reasons already mentioned, the power, and rightful exercise
of that power, cannot now be questioned. And before this
part of the subject is dismissed, it cannot escape remark, that
this ordinance, which directs that grants should not be made
of commons, or other lands, *without license from the king*, is a
clear recognition, *that with his license and authority*, such
grants might be made; and it will remain for those who sus-
tain the proposition that the patent from the general gov-
ernment is null and void, to show how the United States lost
the rights over this place, which the king of Spain had, and
which, by the treaty of cession, they acquired; and how, if
they lost their rights over this place, they retained them over
the other public lands in the state. I will examine this part
of the subject hereafter; at present, I shall merely say, that
I have been unable to bring my mind to the conclusion, that
their right in the *locus in quo*, was less complete than that of
the kings of France or Spain.

The officers of the Spanish government, during the time
it exercised authority in Louisiana, gave permission to indi-
viduals, in several instances, to settle on the space of vacant
ground between the front street and the river, and to some
of the settlers they issued grants. These acts on their part,
no doubt, proceeded from their understanding of the laws
being that which I have just stated to be mine. It was not
until a very late period, that any opposition was raised on
the part of the cabildo, to the exercise of this power, and no
decision was made on that opposition, when the change of
government took place. But, in the year 1799, the intendant

EASTERN DIS.
*February*, 1833.
===========
DE ARMAS
ET AL.
*vs.*
MAYOR, ETC. OF
NEW-ORLEANS

of the colony recognised the validity of these gifts, for notice was given in the general ordinance issued by him, in regard to public lands, to all those who had inchoate titles to any lots in front of the city, to present them, in order that they might be confirmed.   There is nothing in the history of the government of Spain in Louisiana, to induce us to ascribe these acts to a wanton disregard of the rights of the city.— Whether it arose from ignorance of their laws, the imperfect exposition just made of them, may, perhaps, assist in determining.

But, in opposition to the weight which may be attached to the opinions of the Spanish officers in Louisiana, in relation to the rights of the king over a public place, not granted by him to the city, it is proper to state, that, by a decision made by them, they considered, that when a private individual laid out a *faubourg*, and set apart a place for public use, he could not afterwards resume it.   Their decision was appealed from, and the records filed in the superior court at Havana; but owing to its not being carried there within the legal delay, this court, without entering into the merits of the case, held, that the first decree had passed into the authority of the thing judged.   Whether this decision would have been found correct, or not, under the laws of Spain, and would have been confirmed by the appellate tribunal, it is not very material to inquire, as it leaves untouched all the grounds, which have been already gone into so fully, respecting the rights of the sovereign over land of which he had not made a grant, or suffered to remain long enough in the use of the community, to enable it to acquire a title by prescription.   11th *Martin*, 620.

My investigations so far having brought me to the conclusion, that by the laws of France, its monarch retained the right to the soil, and the power of alienation, of any land in a city, for which he had not made a grant; and that the king of Spain, to whom his right was assigned, held it in the same manner, and possessed the same authority over it, the next inquiry is, whether the rights of the United States were co-extensive with those of the monarchs of these countries,

By the treaty of St. Ildefonso, his catholic majesty retro-
ceded to the French republic, the colony of Louisiana, as
he had received it; and by this cession, there can be no doubt,
the government of France was restored to all the public pro-
perty originally ceded by her to Spain, which the latter had
not alienated. In virtue of this cession, France ceded to the
United States, for ever, and in full sovreignty, (to use the
language of the treaty,) the territory of Louisiana, with all
its rights and appurtenances. By these expressions the
ground in question passed, if it was public property. But
the treaty itself does not leave this to inference, for by the 2d
article, it is declared, that under the expression just quoted,
are included the adjacent islands belonging to New-Orleans,
all public lots and squares, vacant lands, all public buildings,
&c. &c. *which are not private property.*

The right and title to the soil of the *locus in quo*, which,
it is admitted, was not private property, therefore passed to
the United States. Notwithstanding this, I admit, that if the
kings of France or Spain had surrendered their right to
alienate it, by irrevocably dedicating the place to the use of
the city, the United States could not grant it to a private
individual. But it is equally true, it appears to me, that if
the kings of France or Spain could have made the premises
now in dispute, the subject of donation to individuals, the
United States have the same power.

But it is said they have lost the power by erecting the terri-
tory of Orleans into a state. The convention which formed
the constitution of Louisiana, acceded to the terms on which
congress admitted us into the Union, and by an ordinance,
forever renounced all right or title, not to the waste *and* unap-
propriated lands, but to the waste *or* unappropriated lands.
This word unappropriated, is not found in Johnson. Webster
defines it: First, not appropriated, not applied or directed to
be applied to any specific object. Second, not granted or
given to any person, company or corporation. I presume it
is in the latter sense the word must be understood; for if taken
in the first, then the fact of the land having been applied to
any specific object, a barrack, fort, or fortification, would

EASTERN DIS.
February, 1833.

DE ARMAS
ET AL
vs.
MAYOR, ETC. OF
NEW-ORLEANS. make the state of Louisiana the owner of such places. The lot on which the custom house is erected, would also belong to her. This I do not think was intended, nor has it been so understood. The state of Louisiana has given us her construction of the terms used, for she has accepted a grant from the United States, of the government house in Levee-street, and the lot on which it was erected. The defendants themselves have furnished us with proof that they did not so understand the act admitting us into the Union. For they have acted under a grant from the United States of a part of the lot on which was situated the new store house in New-Orleans, to continue the street leading from Conti-street to the market house. *See Land Laws*, 611, 835. The meaning of both parties, it appears to me was, that the state should renounce all claim to lands to which individuals, or corporations had not a title. Let the case be examined as it may, I believe we are compelled to return to the main question. Could the *locus in quo* have been granted to individuals, by the monarchs of France and Spain.?

I have not in coming to my conclusions, been much influenced by the facts relied on in argument, that since the change of government the corporation have applied for, and obtained from congress laws vesting a title in them to the commons laid out for the use of the city, and that they also in the same way got a title from the United States, of a lot lying between the front street and the river, within that space of ground which it is now contended the general government has no right to alienate, because I do not think these applications operate as an estoppel to the assertion of any title which they really have. Acts, such as these would be of some importance in showing the understanding of both parties in regard to the question now contested, were it not, that at the time these laws were passed, there is every reason to believe the corporation was ignorant of the existence of a plan, on which the ground in question was designated as a quay.

Some minor questions remain to be disposed of. The fact of a street or public way being laid out by the corporation

Eastern Dis.
*February,* 1833.

DE ARMAS
ET AL.
*vs.*
MAYOR, ETC. OF
NEW-ORLEANS.

since they took possession of the lot, cannot I think impair any right which the plaintiffs had in the premises, before such street was made. The corporation of New-Orleans has no power to turn the owners of lots out of their possessions, and convert their property into streets, without at least making them compensation. Whether they have authority to do so, even on making that compensation, need not now be inquired into.

The title by prescription is not sustained. The laws of Spain required forty years possession in a community. From 1769, when that country acquired title to Louisiana, to 1831, is sixty-two years; during twenty-four of these the *locus in quo* was occupied by the plaintiffs, or those under whom they claim. This leaves but thirty-eight years for the possession of the city.

And as to the right supposed to arise from the establishment of a cabildo, and the incorporation of a city, it may be disposed of by stating, that acts of incorporation may confer a capacity to acquire, but do not in themselves operate as a transfer of property.

Another ground was taken by defendants which requires notice. It was said that the authority which the kings of France, or Spain, could exercise over such places, if in truth it could be at all exercised, arose from the union in the sovereign, of title, and right to regulate the police of the city, and that the latter power having been transferred to the state of Louisiana, by the act of congress erecting her into a state and admitting her into the Union, the United States could no longer dispose of the soil. To what weight this argument might be entitled in a case differently circumstanced from this, it is superfluous to examine. For here the Spanish government in which both right of soil in, and power of control over public places were vested, gave the possession to Bertrand, and the United States supposing nothing to have remained to them but the right of soil, have granted that.

To conclude then, I am of opinion: First, that by the patent produced from the government of the United States, all

27

EASTERN DIS.
February, 1833.
════════════
DE ARMAS
ET AL.
vs.
MAYOR, ETC. OF
NEW-ORLEANS.

the right, title, and interest which they had to the *locus in quo* vested in the plaintiffs.

2. That the inscription of the word *quai* on a plan of the city of New-Orleans, found in the archives of the French government, did not vest title either to the soil, or to the use of it, in the inhabitants of the city.

3. That this plan does not establish a designation to public use of the whole of the place marked as a *quai*, which prevented the sovereign of either France, or Spain, from afterwards appropriating it to his own use, or to that of others. All designations of this kind in either country, leaving the property so designated (unless it was indispensable to the enjoyment of urban property,) subject to the disposal of the monarch, unless he afterwards granted it to the town or community where the place was situated, or that they had possessed and used it a sufficient length of time to acquire a title by prescription.

4. That if the power of the sovereigns of those countries was more limited over public places, than I have concluded, still it could be rightfully exercised over any part of the space in front of the city, not necessary to be used as a quay.

5. That the city has shown no title by prescription; none by converting the lot into a street; none by the acts of incorporation; and none by the erection of the territory of Orleans into the state of Louisiana.

The importance of the case, and the intrinsic difficulties which attend its decision, will explain in some measure, the unusual, and perhaps too great length of this opinion. After all that may be said, the difference of opinion in the members of this court will perhaps be found to arise from the opposite views entertained of the powers of the kings of France and Spain. They who feel unable to divest their minds while considering this case, of the principles of our goverment, or even of those of that European state which once possessed and owned the larger portion of the country which is now the United States, will perhaps conclude that limitations existed on the authority of the Spanish and French kings, which disabled them from alienating property situated

EASTERN DIS.
*February*, 1833.

DE ARMAS
ET AL.
*vs.*
MAYOR, ETC. OF
NEW-ORLEANS.

as this was.    Such a conclusion cannot but be respected, when we reflect on the considerations by which it is obtained. But the lessons which teach it, were not taught I am afraid in those countries at the time when these transactions took place, and cannot now be learned from their laws.    Be the abstract attractiveness of such a doctrine what it may, the duty is devolved on us to decide, not what ought to have been the power of these monarchs, but what it actually was; and for the reasons already given, I think they had such a power, and that we are compelled to recognise it.

It is, therefore, ordered, adjudged and decreed, that the judgment of the District Court be affirmed, with costs.

MATTHEWS, J.

In this case, the plaintiffs claim title as unconditional owners of a lot of ground, which they describe as being situated in the city of New-Orleans, between St. Philip and Main streets, having a front on the old levee of eighty feet, forty-six feet on one of the side lines, and fifty-three on the other, and seventy-nine feet six inches on the rear, where it is limited by the public road, &c.

The evidences of title adduced on the part of the plaintiffs, are, First: a permission to build on and occupy the lot in question, granted by competent authority, in the year one thousand seven hundred and eighty-eight, whilst Louisiana was a province of and under the government of the king of Spain, to Thomas Bertrand.    Second: possession and occupancy of the *locus in quo*, by him until his death, in one thousand eight hundred and three, and continued by his widow and heirs, until one thousand eight hundred and twelve.    Third: claim filed, on the part of the possessors, before the land commissioners of the United States; are port in favor of it, by them, to congress; a confirmation by that body, according to an act passed in one thousand eight hundred and fourteen; and, finally, a patent or grant, issued in due form, by the proper authority, in the year one thousand

EASTERN DIS.
February, 1833.

DE ARMAS
ET AL.
vs.
MAYOR, ETC. OF
NEW-ORLEANS.

eight hundred and twenty-one. All the right, title and interest which the grantees acquired, have been regularly conveyed to the plaintiffs.

The validity of the title thus set up on the part of the plaintiffs, as constituting them absolute proprietors of the lot claimed, is denied by the defendants.

The patent, or grant, from the United States, is alleged to be inefficient to convey title to the grantees, as having been issued by the president without legal authority. Reference is made to the laws under which the patent was issued, in the instrument itself; and I am of opinion, that a proper construction of them warrants the authority assumed by the chief magistrate, so far as to convey all the title which the United States had in the premises, to the grantees, and is confirmative of that which they had obtained from the Spanish government. The right which they acquired from the former sovereign of the country, and which seems to be the basis of the grant from the United States, was, as shown by the evidence of the cause, a permission to build on and occupy the lot of land in question; it was, in truth, a permission to settle on it. But the tenure by which the possessors held the premises, (perhaps) depended on the will of the power which gave the permission to possess and occupy. The authority of the government, however, which permitted the occupancy, ceased before any change of will was expressed; and that which succeeded, has, by its grant, rendered the tenancy, which may have previously been temporary, absolute and unlimited; giving to the grantees all the *right* and *title* which any of the sovereigns of the country at any time had, to the parcel of ground now in controversy—according to the various transfers which took place, from the king of France to the Western Company constituted by his authority; from them retro-ceded to their sovereign; from this power ceded to the monarch of Spain; from him to the French republic, and from the latter to the United States.

Permission having been given by the governor of Louisiana, when a province, to occupy and build on a lot of land in the city of N. Orleans, and the authority of the government which gave the permission, having ceased without a change of will being expressed, a subsequent grant by the president of the U. S. to the occupant, under that permission, vests in him all the right and title of the U. States, and of the former sovereigns of the country.

According to this view of the case, I consider the plaintiffs as standing in the situation of persons claiming property under a grant from the Spanish government, as the basis of

their title; and consequently, they must succeed in their claim, unless the defendants have shown a better title in themselves, or that the property claimed was inalienable at the time of the grant, either from its place amongst other natural things, or by political and legal destination. It is already perceived, by the bare statement of these premises, that I assume as true, the right of property in the sovereign of Spain, to all the unappropriated territory of the province of Louisiana, such as it was held by France, previous to the cession to the Spanish monarchy by the former owner.

While the province of Louisiana formed a part of the dominions of the king of Spain, he had the right of property in all the unappropriated territory of the province.

By the transfer, all the lands of the colony not previously granted, became a part of the public domain of the king of Spain, who, at the time of the acquisition, possessed complete and unlimited sovereignty over all his dominions. Certain portions of this sovereign power, were necessarily delegated to viceroys, governors, and other colonial officers of the king; by this delegation they possessed limited attributes of sovereignty, amongst which appears to be the right to concede or grant to individuals, parts of the land belonging to the public domain. The truth of this position is evidenced by the uniform mode by which grants were obtained in Louisiana, whilst under the dominion of Spain; and it cannot be denied, that this power was exercised by the proper officers at the time when the permission to build on and occupy the *locus in quo*, was allowed to Bertrand, under whose heirs the plaintiffs now claim title, this permission having since assumed the character of an unconditional grant.

The king of Spain delegated to the governor of Louisiana, while a Spanish province, the right to concede or grant to individuals, parts of the land belonging to the public domain.

Whatever questions may have been raised and commented on by authors, who have examined the different political institutions of the states and kingdoms of Europe, relative to the right of their sovereigns to alienate certain things belonging to the public domain; certainly no doubt can now properly exist as to that right, in relation to the vacant and unappropriated lands in their colonial dominions; which have been constantly granted to individuals ever since the establishment of colonies in America.

The sovereigns of Europe have the right to alienate the vacant and unappropriated lands in their colonial dominions.

The title or right of property claimed, to the lot in question, by the defendants, as a common of the city, has been

EASTERN DIS. so fully examined by the judge with whom I concur in opin-
*February,* 1833.
ion as to all the important questions presented by this case,
DE ARMAS and so clearly shown to be without foundation, that I deem
ET AL.
*vs.* it needless to investigate this point of the cause. In truth,
MAYOR, ETC. OF
NEW-ORLEANS. as to this matter, no difference of opinion seems to be enter-
tained by any one of the members of the court.

A plan of the city of New-Orleans, which purports to
have been made in 1728, is introduced in evidence on the
part of the defendants, obtained from an office in Versailles;
a place of deposite for official papers and documents relating
to the cities and forts of the French colonies in America.
This document is relied on by them as establishing a right of
use to the public, incompatible with private ownership of
any part of the space of land marked and designated on this
plan by the word *quai.* The city being laid out in front of
a bend in the river formed by nature, in such a manner as
to exhibit a portion of an ellipsis, the plan shows an irregular
space between the first line of houses and the river, which
is much wider at the extremities of this bend than in the
centre; and this is the space denominated a *quai;* the greater
part of which has never been used as such, particularly towards
the limits of the city.

The question as to the right of property in the corporation
being disposed of, it only remains to examine their opposition
to the claim of the plaintiffs, on the assumption that the lot of
ground sued for, was at the commencement and perfection
of their title, a place designated and appropriated perpetually
to the use of the public, by legal effect of the establishment
and plan of the city; and consequently inalienable as being
unsusceptible of individual ownership.

In the investigation of this question, much reliance was
placed on the proper meaning of the word *quai,* and a just
idea of the thing intended to be conveyed to the mind by its
use; the assistance of philology must necessarily be called
in aid, for in this respect, it is in some degree an affair of
words.

The definition given to this word in French, according to
the *Dictionaire Critique de Feraud,* is " *Levée fait entre la*

*riviere, ou l'eau d'un port et les maisons, pour la commodite du*
*chemin, et pour empêcher le débordement_dans les creux d'eau.*"

The meaning of this word as understood in France and her colonies, (according to the citation made by judge Moreau, in his Brief of Argument, from *Langlade, Nouvelle Legislation, aut mots plans des villes*,) does not materially differ from the definition given by Feraud.   By this author, *quai* is defined to be " *Une levée souvent revetué de peine detaille, dans les villes ou ports situés sur les revieres navigables et dans un espace laissé vacant entre la riviere meme at la primiere ligne des maisons, pour la commodite du chemin, et pour empêcher le debordement de l'eau.*"

The definition by other French lexicographers, is nearly similar to that quoted by Feraud.  (*See Duboille* and *Deverger.*) These philologists show that it conveys the idea of an artificial work or bank raised by the labor of man.   Quay, according to Dr. Johnson, means an artificial bank to the sea or river, on  which goods may be conveniently unladen.

The greatest portion of the space delineated on the plan of the city introduced in evidence, as existing·between the front line of houses , or lots laid out for building on, and the river, was evidently not a *quai*, (according to the general acceptation of that word,) at the time this plan was made; nor was it such at the time Bertrand obtained permission from the proper authority of the Spanish government .to occupy the lot of ground now in dispute.   Neither was this small space a part of the *quai*, properly speaking, at the.time of the grant from the United States; for it appears. by the testimony of the city surveyor, that the levee was not extended over it until the year eighteen hundred and twenty-two, and the grant bears date the year preceding.

But, perhaps, it may be required that some effect should be given to the word *quai*, inscribed on the plan.   This may be done by allowing it reference to that part of the space whereon it is found, which was a *quai*, according.to the meaning of the word as generally received; *i. e.* the levee which existed on the bank of the river and the shore, between the exterior of the levee and the water.

*The word quai, includes the levee on the bank of the river, and the space between the exterior limit of the levee and the water.*

EASTERN DIS.
*February,* 1833.
═══════════
DE ARMAS
ET AL.
*vs.*
MAYOR, ETC. OF
NEW-ORLEANS.

If, however, it be admitted that this whole space was intended to be a *quai* of the port of New-Orleans, it does not follow as a legal and necessary consequence, that no part of it could be alienated by the sovereign of the country; it being admitted that this species of property may be either public or private. And it seems to me to be of the very essence of the inalienability of things according to political rules, that they are not susceptible of private or individual ownership.

Toullier, in his Commentaries on the *Droit Civil Français*, distinguishes between things belonging to the public domain which are susceptible of private property, and those which are not. Amongst the latter class are placed navigable rivers, ports, harbours, roads, (*les rades*) which, by their nature are not more susceptible of possession by individuals, than the sea and the waters which cover it, of which the right of property is vested in no one, but the use of which is common to all; subjected to police regulations which direct the manner of enjoying it. *Volume* 3, *no.* 36. All other things belonging to the public domain are susceptible of private ownership; but some of these enter into commerce, others do not. *Number* 38. *Les biens hors du commerce, sont ceux qui ne sont pas susceptibles d'une propriété privée. Tels sont les chemins, les routes, les rues, les edifices publics, les eglises, les portes, murs,* &c. *Number* 39. These Commentaries, although purporting to be on the *Code Napoleon*, seem to embrace in part the doctrines contained in Domat's Treatise on the Public Law of France. In the section of that work which treats of things which serve for public uses, we find express mention made of public places, which may be considered as *hors du commerce.*

Political regulations similar to those which exist in France, seem also to prevail in the Spanish monarchy. *See* 5 *Partidas, title* 5, *case* 15, with the notes of *Lopez.*

They appear to have been adopted from the Roman Civil Law, or as sometimes denominated, *jus gentium,* perhaps improperly.

The principles on which these regulations are based, are to be found in the *Roman Digest Book,* 43, *titles,* from 7 to 12,

inclusive. A great proportion of the laws which these titles
contain, are mere police rules or ordinances, perhaps inap-
plicable to modern states and kingdoms. Their principal
utility in affording any light on the present investigation,
arises from the definitions found therein of things public, or
such as are appropriated exclusively to public uses.

To admit the right of the defendants to question the title
of the plaintiffs, derived as it is from the sovereign power of
the country, without showing any title in themselves to the
thing in litigation, it must rest solely on their authority to
interfere in relation to the police of public places; and whe-
ther this authority extends to places which in no manner be-
long to the city might be questioned. The United States
by virtue of that sovereign power, (limited as it may be in
regard to the several states of the Union) have full authority
over all the ports which belong to this Union, necessarily to
enable the general government to collect duties imposed on
foreign merchandise. By them ports of entry can be esta-
blished, and perhaps abolished. And there would be nothing
unreasonable or unjust in an assumption of power in
them, to regulate quays, as an appendage of the ports, where
all goods imported should be landed, to facilitate and secure
collection of the public revenues.

The United States
have full authori-
ty over ports of
entry; they can
establish, and per-
haps abolish them;
and they may re-
gulate quays as
appendages to
them.

But let the case be considered as if the defendants had a
right to interpose, and contend for the public use of the *locus
in quo*. It is a public place, either from its natural situation,
or by destination of the sovereign power which laid out the
city. It is not a place which the public have a right to use
in common, by its nature. It is no part of a navigable river,
or of the bank of such river. "*Ripa ea putatur esse quæ
plenissimum flumen continet. Secundùm ripas fluminum loca
non omnia publica sunt: cùm ripæ cedant ex quo primum à plano
vergere incipit usque ad aquam.*" *R. D.* 43, 12, 111, 1 and 2.
It is proper here to give the translation of Roduguoz. *Los
terrenos inmediatos à las riberas de los rios, no todos son publi-
cos; porque cede á la ribera todo lo que empieza á declinar desde
lo llano hasta el agua.*

28

EASTERN DIS.
February, 1833.

DE ARMAS
ET AL.
vs.
MAYOR, ETC. OF
NEW-ORLEANS.

On the border of the Mississippi, that space which extends from the exterior limit of the levee to the water, may be considered as the bank, where no batture intervenes; the lot in question was out side of the levee at the time of the commencement of the plaintiffs title, and continued to be so situated up to the period of the grant from the United States. And it was not at either of those periods a part of the public highway or road for its location is betwixt the levee and the road, as they then existed. By the aid of philology, it has already been shown, (properly speaking) that it made no part of the quai. Was it any part of a public plan, *place publique* in French, *plaza* in Spanish? It is not designated as such on the plan of the city, and I do not think that the bare circumstance of its having been left vacant on that plan, suffices to give this character to that space, of which it made a part. This seems to have been the understanding the officers of all the governments into whose hands Louisiana has fallen at different times. Witness the apparent occupation of lots for private purposes, situated within its limits, according to one of the plans exhibited, as having been made whilst the colony was under the control of the Western Company or of France; the grants of various parts of it by the authorities of Spain, and finally the grant now produced for the lot in dispute. The grants from the Spanish government were to Lioteau, to Magnon, and to Metzinger. The title under this last grantee, was questioned by the corporation of the city, and a decision of the Supreme Court pronounced, in the case as reported in 3 *Martin*, begining at page 303. This decision is cited by the defendants in the present instance, as favorable to their pretensions. I cannot view it in that light. I do not perceive that the production of the plan of the city, places them in a more favorable situation in the present case, than they were in the former. This plan does not show the *locus in quo* to be a part of a street, public road, or any other public place. In my view, it is a part of vacant land in the city, which belonged in full and unconditional property to the Western Company of France, and as such was by them retroceded to that monarch, and as

*The circumstance that a space of ground is left vacant on the plan of a city, is not sufficient to show it to be a public place.*

such has from him through intermediate transfers been regularly transferred to the United States, was a fair subject of alienation, and has been legally granted to Bertrand's heirs, under whom the plaintiffs claim title.

EASTERN DIS.
*February*, 1833.

DE ARMAS
ET AL.
*vs.*
MAYOR, ETC. OF
NEW-ORLEANS.

Squares or other spaces of land appearing to be left vacant in the plan of a town or city, are not (in my opinion) in consequence of this fact alone, to be considered as public places, and irrevocably dedicated to the use of the whole world. The plan ought to contain something on its face to show their destination and appropriation to such use, in order to imply a promise on the part of the original owner of the soil, and founder of the city, that they should always remain open for the use of the citizens and the public in general.

The plan of the city must show the destination and appropriation of lots to public uses, and as public places, in order to imply a promise on the part of the original owner of the soil and founder of the city, that the lots shall always remain open for the use of the public.

There may have been want of wisdom and foresight in the sovereigns who made these grants as above stated. The occupancy and use of the lots thus granted by individuals, and for private purposes, may be very detrimental to the interest of the public at the present time, in consequence of the increased and increasing commoner of the city. But these are considerations which cannot be taken into view, in deciding on the vested rights of the parties litigant, involving mainly questions of title.

In deciding questions of title, the court cannot take into view the want of foresight in the sovereigns of the country in granting the land in controversy to individuals, or the great detriment which the public interest may sustain by the appropriation of the land to private purposes.

In truth I am unable to perceive any substantial difference existing in this case, from that of Metzinger, and I hold the maxim *stare decisis* to be a good one. The same measure of justice should be meted to each and every one standing in similar circumstances.

It is seen from this view of the case, that I have omitted to consider many of the authorities which relate solely to police regulations, touching the property of a state, or that of a city, or town incorporated, believing that they afford little aid in the decision of the present dispute.

Eastern Dis.
February, 1833.

DE ARMAS
ET AL.
*vs.*
MAYOR, ETC. OF
NEW-ORLEANS.

*Eustis*, for appellants, moved the court to grant a rehearing of this cause, on the following grounds:

1. That the validity of the patent could be inquired into under the decisions of the Supreme Court of the United States.

2. That it is an error of fact to assume that there was any permission from the Spanish government to *settle on and occupy the lot in controversy.*

3. That it is an error of fact to assume that the commissioners acted in a legal sense on the claim of those whom the plaintiffs represent.

4. That it is an error of fact to assume that the spot in question was what is called in the land laws *vacant land or lands.*

5. That the sense in which the word *quay* is used by the court, is contrary to its known application in the country to whose language it belongs.

6. That as to the fact of the destination of places for public purposes, the rule must be the same every where, unless there be a positive law to the country: It being a matter of contract, and what is just in one place, is just in another.

7. That the principles laid down in the cases relating to the cities of Cincinnati and Pittsburg, have been recognised in Louisiana under the Spanish dominion, by the highest judicial tribunal in the colony, and virtually in the case of the present defendants against Metzinger, in which this court says "*no plan of the city has been exhibited* to show that the lot of the appellee is located *upon a place which had been reserved for public use:*" because if a plan of the city could have *shown the place to have been reserved for public use,* it must have had the same legal effect, which it is contended the plans of the city in evidence ought to have.

8. That by the plan and establishment of the *city, a quai* was established in front of the city as described in the plans.

9. That a *quai* in French is a public place, of which the public have the use, and which of right must be free and open to all; as roads, streets, harbors, ports, &c.

EASTERN DIS.
February, 1833.

DE ARMAS
AT AL.
vs.
MAYOR, ETC. OF
NEW-ORLEANS.

10. That the use of the spot in controversy is necessary to the enjoyment of the other public rights, the free and convenient use of that part of the port.

11. That if the front of the city, as laid down in the plans, was constituted a quay or public place, the right of the sovereign over it was a matter of prerogative, which varied according to the different institutions of the government to which Louisiana has been subjected.

12. That the right of soil might be in the sovereign, and the use in the public; that this was the case in all public places in Louisiana as in England, under the common law.

13. That this right of use is a vested right, as much so as any right of property; it is subject to the regulation of the sovereign power alone, viz: the power in which the right of making laws is vested.

14. That this sovereign right of regulating the uses of public things is inseparable from sovereignty.

15. The United States held this power during the time they held the sovereignty of Louisiana.

16. That on the admission of Louisiana into the Union by the act of April, 1812, this branch of sovereignty, was vested in the state of Louisiana and ceased to be in the United States.

17. That subsequently to that period, the United States have no more right to regulate the use of public places in Louisiana, than in Virginia or New-York.

18. That although the United States had the right of soil in the streets, beds of rivers and public places in Louisiana, it was held in right of sovereignty and not as property subject to alienation.

19. That after the admission of Louisiana into the Union, the United States, by the operation of the constitution, was divested of this ultimate sovereign right, which fell to the state of Louisiana.

20. That the state of Louisiana has alone the right of regulating the use of public things in Louisiana, and as the sovereign has the right of disposing of the soil of all shores of the sea, roads, ports, and public places, not being private

EASTERN DIS.
*February,* 1833.

DE .ARMAS
ET AL.

*vs.*

MAYOR, ETC. OF
NEW-ORLEANS.

property, when their destination becomes changed, so that they can be no longer continued in the public use.

21. That the law of prescription is with the defendants.

22. That no act was done by the French royal government in derogation of the original plan of the city. No attempt was made to change the destination of the place as a quay or to appropriate it to private purposes.

23. That the Spanish government never alienated the spot in controversy; that the permissions to build were temporary and precarious and conferred no rights to the tenant adverse to the public right.

24. That by the laws of Spain the crown could not alienate public places, although the crown could regulate the use, and grant permission to build on them.

25. That by the laws of France under the consular government, if *quais* appertained to the domain, they formed a part of the *grand domain*, the right to which is inseparable from the sovereign power, and was held in sovereignty and not as property.

26. That on this hypothesis, that is of quays appertaining to the grand domain, the United States acquired and held the spot in question in sovereignty and not in property.

27. That this distinction between the right of property and the right of sovereignty is recognised by publicists, and necessarily exists in all governments. *Dom. Pub. Law, b.* 1. *tit.* 6, *sec.* 1, *art.* 1, 2.

28. No alienation of this spot having been made by any of the preceding governments of Louisiana; none having been made by the United States while they held the sovereignty of Louisiana, the rights of the public can only be affected by the legislation of the sovereign power, which on this subject is vested in the state.

29. That the title of the plaintiffs emanating from a power which had no authority to grant it, having no jurisdiction or authority over the soil, or its uses, is null and void; and the defendants must be left undisturbed in the enjoyment of their public right.

The motion for a rehearing in this case, was refused.